Bryan David **PRICE,** Brian A. **Singleton,** and Stephen M. **Morris, Plaintiffs,**

v.

**THE NATIONAL BOARD OF MEDICAL EXAMINERS, Defendant.**

**Civil Action No. 3:97–0541.**

United States District Court, S.D. West Virginia, Huntington Division.

June 6, 1997.

---

Kimberly J. Carpenter, Pullin, Knopf, Fowler & Flanagan, Charleston, WV, for Plaintiffs.

Nancy C. Hill, Carey, Hill & Scott, Charleston, WV, for Defendant.

## MEMORANDUM ORDER, FINDINGS OF FACT AND CONCLUSIONS OF LAW

GOODWIN, District Judge.

Three Marshall University School of Medicine students seek injunctive relief compelling the National Board of Medical Examiners (Board) to provide each of them with additional time for the United States Medical Licensing Examination (USMLE) and with a separate room in which to take the examination. Plaintiffs claim that these accommodations are mandated by the Americans with Disabilities Act of 1990(ADA), 42 U.S.C. § 12189.[1] The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because it arises under the laws of the United States. Prior to the injunction hearing, this Court notified the parties that the proceeding would be considered as a trial on the merits, consistent with Rule 65(a)(2) of the Federal Rules of Civil Procedure. Neither party objected.

The ADA is not designed "to allow individuals to advance to professional positions through a back door. Rather, it is aimed at rebuilding the threshold of a profession's front door so that capable people with

---

1. 42 U.S.C. § 12189 states in pertinent part that, "Any person that offers examinations ... related to applications, licensing, certification, or credentialing for ... professional ... purposes shall offer such examinations ... in a place and manner accessible to persons *with disabilities* or offer alternative accessible arrangements for such individuals." (Emphasis added.)

unrelated disabilities are not barred by that threshold alone from entering the front door." Jamie Katz & Janine Valles, *The Americans with Disabilities Act and Professional Licensing,* 17 MENTAL & PHYSICAL DISABILITY L. REP. 556, 561 (Sept./Oct.1993). If a court were to grant testing accommodations to persons that do not have disabilities within the meaning of the ADA, it would allow persons to advance to professional positions through the proverbial back door. In so undermining the integrity of the USMLE, that court would hinder the Board's ability to distinguish between qualified students and unqualified students.

■ Although this Court does not question the good faith of the plaintiffs in this case, the fundamental question in this matter is whether each of the plaintiffs has a disability within the meaning of the ADA. The case turns on the meaning of "substantially limits," a phrase used in the definition of "disability" set forth in § 12101 of the ADA. The parties disagree about when an impairment "substantially limits" a major life activity. After a review of the legislative history, the relevant implementing regulations, and pertinent case law, this Court concludes as follows: An impairment substantially limits a person's major life activity when the individual's important life activities are restricted as to the conditions, manner, or duration under which they can be performed *in comparison to most people in the general population.* In this case, plaintiffs are able to learn as well as or better than the average person in the general population. Accordingly, judgment is **ORDERED** in favor of the defendant.

## I. Findings of Fact

The Court makes the following findings of fact: Plaintiffs Bryan D. Price, Brian A. Singleton, and Stephen M. Morris are students at the Marshall University School of Medicine. Each of the plaintiffs has completed the equivalent of two years of study. After completing the requirements of the first two years, Marshall medical students must pass Step 1 of the USMLE to continue at Marshall's medical school. The Board administers the USMLE and is the defendant in this action.

Plaintiffs are scheduled to take the USMLE on June 10 and 11, 1997. Each of the plaintiffs has been diagnosed by the National Center of Higher Education for Learning Problems (HELP) with Attention Deficit Hyperactivity Disorder (ADHD). Two of the three plaintiffs have been diagnosed by HELP with Disorder of Written Expression and Reading Disorder, specific learning disabilities. Relying on HELP's diagnoses, plaintiffs seek injunctive relief compelling the Board to provide each of them with additional time for the USMLE and with a separate room in which to take the examination. Plaintiffs claim that these accommodations are mandated by § 12189 of the ADA.

Claiming the aforementioned disorders, plaintiffs sent timely applications to the Board requesting additional time and private rooms when taking the examination. The Board submitted plaintiffs' applications to independent, highly qualified experts in the fields of ADHD and learning disabilities. By separate letters written on May 1 and 7, 1997, the Board denied the requests, asserting that plaintiffs' alleged impairments did not significantly restrict one or more of their major life activities. On May 23, 1997, plaintiffs commenced this action to compel the Board to grant their requests for additional time and separate rooms while taking the USMLE.

Each of the plaintiffs claims to have ADHD. ADHD is a psychiatric disorder. The Court finds that the *Diagnostic & Statistical Manual of Mental Disorders, Fourth Edition* (DSM–IV) accurately explains the symptoms and nature of ADHD. ADHD's essential feature is a persistent pattern of inattention and/or hyperactivity-impulsivity that is more frequent and severe than is typically observed in individuals at a comparable level of development. Some hyperactive-impulsive or inattentive symptoms that cause impairment must have been present in the individual before he or she reached seven years of age. Impairment from the symptoms must be present in at least two settings. To be diagnosed with ADHD, an individual must clearly evidence interference with developmentally appropriate social, academic, or occupational functioning. The disturbance

experienced by the individual cannot be better accounted for by other mental disorders, which should be ruled out by a differential diagnosis.

Two of the three plaintiffs also claim to have Reading Disorder and Disorder of Written Expression. Reading Disorder and Disorder of Written Expression are specific learning disabilities. Specific learning disabilities are less severe than ADHD, but in order to qualify as a person with a disability under the ADA, persons claiming specific learning disabilities must show that they are substantially limited in one or more major life functions.

In his report submitted to the Board, Mr. Price claimed that he has ADHD of the Predominantly Inattentive Type. Mr. Price's report was signed by Barbara P. Guyer, Ed. D., Debbie Painter, M.A., Charles Painter, M.A., and Sara Barker, M.A. On behalf of the Board, Professor Russell A. Barkley, Ph. D., reviewed Mr. Price's application for accommodations. Professor Barkley concluded that Mr. Price had not provided sufficient documentation to support a clinical diagnosis of ADHD.

This Court finds that Mr. Price has not exhibited a pattern of substantial academic difficulties. Without accommodation, he graduated from high school with a 3.4 grade point average and from Furman University with a 2.9 grade point average. After receiving testing accommodations while taking the MCATs, Mr. Price was admitted to medical school. There is little evidence that Mr. Price's symptoms resulted in significant impairment in home, school, or work functioning. Because a differential diagnosis was never performed on Mr. Price, other disorders that can result in attentional or academic problems were not properly ruled out. Further, Mr. Price had no history of treatment for ADHD until 1994, when he was diagnosed and prescribed medication.

The evidence submitted in support of the claim that Mr. Price has ADHD is less convincing than and is outweighed by the testimony of Professor Barkley. The Court finds that Professor Barkley's clear and consistent testimony renders him the most credible witness regarding the diagnosis of ADHD. Furthermore, Professor Barkley helped draft the DSM–IV, which both parties agree is authoritative in the diagnosis of ADHD. After considering all of the experts' conclusions, the Court finds Professor Barkley's testimony more compelling.

In his report submitted to the Board, Mr. Singleton claimed that he has ADHD of the Combined Type, as well as Reading Disorder and Disorder of Written Expression. Mr. Singleton's report was signed by Barbara P. Guyer, Ed.D., Debbie Painter, M.A., and Charles Painter, M.A. No differential diagnosis ruling out other mental disorders was performed on Mr. Singleton. On behalf of the Board, Professor Michael Gordon reviewed Mr. Singleton's application. Professor Gordon concluded that Mr. Singleton had not provided sufficient documentation to support a clinical diagnosis of ADHD. Dawn P. Flanagan, Ph.D., also reviewed Mr. Singleton's application for accommodation. Ms. Flanagan concluded that Mr. Singleton had not provided sufficient documentation to support the diagnoses of Reading Disorder and Disorder of Written Expression.

Mr. Singleton has not exhibited a pattern of substantial academic difficulties. He was in a gifted program from second grade through his high school graduation. He graduated from high school with a 4.2 grade point average and was the state debate champion. Mr. Singleton earned admittance to the United States Naval Academy. He eventually graduated from Vanderbilt University, earning a degree in physics. Mr. Singleton was then admitted to medical school. All of these accomplishments were attained without any accommodation for his alleged disability.

This Court recognizes that Dr. MacCallum, Mr. Singleton's treating physician, is a competent and accomplished psychiatrist, and that he diagnosed Mr. Singleton as having ADHD. However, the evidence submitted in support of Dr. MacCallum's claim that Mr. Singleton has ADHD, Reading Disorder, and Disorder of Written Expression is less convincing than and is outweighed by the testimony of Professor Gordon and Ms. Flanagan. After considering all of the experts' conclu-

sions, this Court finds Professor Gordon's and Ms. Flanagan's testimony more compelling.

In his report submitted to the Board, Mr. Morris claimed that he has ADHD of the Combined Type, as well as Reading Disorder and Disorder of Written Expression. Mr. Morris's report was signed by Barbara P. Guyer, Ed.D., Debbie Painter, M.A., Charles Painter, M.A., and Sara Barker, M.A. No differential diagnosis ruling out other mental disorders was performed on Mr. Morris. On behalf of the Board, Professor Barkley reviewed Mr. Morris's application for accommodations. Professor Barkley concluded that Mr. Morris had not provided sufficient documentation to support a clinical diagnosis of ADHD. George B. Litchford, Ph.D., also reviewed Mr. Morris's application. Mr. Litchford concluded that Mr. Morris had not provided sufficient documentation to support the diagnoses of Reading Disorder and Disorder of Written Expression.

Mr. Morris has not exhibited a pattern of substantial academic difficulties. In high school, he was a National Honor Student. Although his academic performance was very poor during his first year at Virginia Military Institute (VMI), his grades improved in the following years, and Mr. Morris graduated from VMI with average grades. Mr. Morris then attended Sheperd College to earn the necessary science requirements for medical school. At Sheperd, Mr. Morris maintained a 3.5 grade point average. He was admitted to medical school. All of these accomplishments were attained without accommodation for Mr. Morris's alleged disability.

The evidence submitted in support of Mr. Morris's claim that he has ADHD, Reading Disorder, and Disorder of Written Expression is less convincing than and is outweighed by the testimony of Professor Barkley and Mr. Litchford. After considering all of the experts' conclusions, this Court finds Professor Barkley's and Mr. Litchford's testimony more compelling. Based upon the entirety of the record, this Court finds that each of the plaintiffs has an average or greater than average ability to learn. Furthermore, there is no evidence to suggest that special accommodations while taking the USMLE, including extended time, would benefit persons properly diagnosed with ADHD.

## II. Conclusions of Law

With respect to an individual, the ADA defines "disability" as:

> (A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;
>
> (B) a record of such an impairment; or
>
> (C) being regarded as having such an impairment.

42 U.S.C. § 12102(2). Each of the plaintiffs contends that he has a disability within the meaning of subsection (A). The ADA does not define three phrases that are critical to understanding the nature of an ADA disability: "physical or mental impairment," "substantially limits," and "major life activities." This case turns on the interpretation of the phrase "substantially limits." Both parties agree that ADHD, Disorder of Written Expression, and Reading Disorder (disorders) are mental impairments for purposes of the ADA. Likewise, both parties agree that these disorders affect the major life activity of learning. However, the parties disagree whether the plaintiffs' alleged disorders "substantially limit" their ability to learn.

Congress imported the phrase "substantially limits" from the Federal Rehabilitation Act of 1973(FRA), 29 U.S.C. § 706(7)(B) (1985). A review of FRA case law addressing the phrase indicates that courts have not fashioned a manageable interpretation of it. *See* James M. Zappa, Note, *The Americans with Disabilities Act of 1990: Improving Judicial Determinations of Whether an Individual Is "Substantially Limited"?*, 75 MINN.L.REV. 1303, 1314 n. 58 (1991). Nevertheless, Congress incorporated the phrase within the ADA's definition of disability.

### (a) Legislative History

ADA legislative history offers some guidance as to the phrase "substantially limits." The report of the Senate Committee on Labor and Human Resources, the congressional committee which developed the ADA's structure, notes that substantially limiting impairments cannot be "minor" or "trivial." S.REP. No. 101–116 (1989), *available in* West-

law, at A & P S. Rep. 101–116, *23; *see also* H.R.REP. No. 101–485, (II) (1990), *available in* Westlaw, at A & P H.R. Rep. 101–485, *52, U.S.Code Cong. & Admin.News 1990, at 303, 334. Rather, the impairments must restrict an individual's major life activity as to the "conditions, manner, or duration under which [the activity] can be performed *in comparison to most people.*" S.REP. No. 101–116, *available in* Westlaw, at A & P S. Rep. 101–116, *23 (emphasis added). To illustrate, the Senate report uses the following example:

A person who can walk for 10 miles continuously is not substantially limited in walking merely because on the eleventh mile, he or she begins to experience pain because *most people* would not be able to walk eleven miles without experiencing some discomfort.

*Id.* (emphasis added). "Most people" can be reasonably interpreted to mean that the individual is restricted to a greater degree than a majority of people. The above illustration strengthens this conclusion. The Committee did not compare the individual who experienced pain on the eleventh mile to a class of persons who can walk eleven miles painlessly. Instead, the Committee compared the individual in question to *most people,* that is, a majority of people. Accordingly, to determine whether an individual is substantially limited in performing a major life activity, Congress would have this Court measure the extent to which the alleged impairment limits the individual against the abilities of most unimpaired persons.

### (b) Executive Agencies' Interpretation

■ Because Congress defined disability in the overarching Definitions section of the ADA, no single agency has the authority to issue regulations defining "disability" for use throughout the ADA. However, Congress divided the regulatory authority among three agencies. Congress authorized the Attorney General (Department of Justice or DOJ) to issue regulations regarding Part A of the Subchapter on Public Services, as well as Subchapter III, which addresses services operated by private entities. *See* 42 U.S.C. §§ 12134, 12186. Congress authorized the Equal Employment Opportunity Commission (EEOC) to issue regulations regarding Subchapter I, which addresses workplace discrimination. *See id.* § 12116. Congress authorized the Secretary of Transportation to issue regulations for the public transportation Subparts. *See id.* §§ 12149, 12164. Because "Congress explicitly delegated to [these] administrative agenc[ies] the authority to make specific policy determinations, [courts] must give the[ir] decision[s] controlling weight unless [they are] 'arbitrary, capricious, or manifestly contrary to the statute.'" *ABF Freight Sys., Inc. v. NLRB,* 510 U.S. 317, 324, 114 S.Ct. 835, 839, 127 L.Ed.2d 152 (1994) (quoting *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 844, 104 S.Ct. 2778, 2782–83, 81 L.Ed.2d 694 (1984)).

Section 12189, at issue in this case, is covered by the DOJ regulations in 28 C.F.R. part 36. These regulations help define the phrase "substantially limits." Borrowing heavily from the committee reports referenced above, the DOJ regulation states that a person is substantially limited "when the individual's important life activities are restricted as to the conditions, manner, or duration under which they can be performed in comparison to most people." 28 C.F.R. pt. 36, app. B (1996).

The EEOC also has issued regulations construing the phrase "substantially limited."[2] Those regulations state that, "An individual is not substantially limited in a major life activity if the limitation does not amount to a significant restriction when compared with the abilities of the average person." 29 C.F.R. pt. 1630, app. (1996). The EEOC regulations elaborate that "an individual who had once been able to walk at an extraordinary speed would not be substantially limited in the major life activity of walking if, as a

---

**2.** The EEOC guidelines do not govern § 12189 because the guidelines pertain only to Subchapter I. However, Congress clearly intended for the term "disability" (and, therefore, the phrase "substantially limits") to have a uniform meaning throughout the ADA. Accordingly, wherever possible, the Court must define the phrase "substantially limits" in a manner consistent with each of the agencies' interpretations.

result of a physical impairment, he or she were only able to walk at an average speed, or even at moderately below average." *Id.*

### (c) Case Law

Plaintiffs cite *Pazer v. New York State Board of Law Examiners*, 849 F.Supp. 284 (S.D.N.Y.1994), to support their position that average performance does not necessarily preclude an individual from qualifying as a person with a disability under the ADA. In *Pazer*, the court considered whether a student with a visual processing disability was entitled to accommodations for his bar exam. In spite of his alleged impairment, the student in *Pazer* functioned better than most people. Defendant Board of Law Examiners argued that the student's above-average functioning precluded the court from qualifying the student as a person with a disability under the ADA. The *Pazer* court was unpersuaded by the defendant's argument. The court found that the DOJ's testing regulation, *see* 28 C.F.R. § 36.309 (1996),[3] conflicted with an interpretation of "substantially limits" that compares an individual's impaired functioning to that of the average person. The *Pazer* court focused on the section's mandate that an individual's "aptitude or achievement level" be reflected by the examination. Noting this, the district court halfheartedly found that there was "some merit to the argument that a disparity between inherent capacity and performance on a test may, in some circumstances, permit the inference that an individual has a learning disability, even though that individual's performance has met the standard of the ordinary person." *Pazer*, 849 F.Supp. at 287.[4]

This Court respectfully disagrees for two reasons. First, a "learning disability" does not always qualify as a disability under the ADA. In order to be a person with a disability under the ADA, the individual must have a physical or mental impairment and that impairment must substantially limit a major life activity. 42 U.S.C. § 12102(2)(A); *see Dutcher v. Ingalls Shipbuilding*, 53 F.3d 723, 726 (5th Cir.1995). The comparison to "most people" is required to determine whether a learning disability rises to the level of a disability under the ADA. *See* 28 C.F.R. pt. 36, app. B (1996). Second, 28 C.F.R. § 36.309 does not conflict with this Court's understanding that an impairment must limit a person in comparison to most people. The testing regulations only apply to individuals who have disabilities under the ADA. When a person is found to have a disability, § 36.309 is triggered and examinations must be administered to reflect an individual's aptitude, achievement, or whatever else the examination purports to test. For persons without disabilities under the ADA, § 36.309 does not apply.

Numerous cases support this Court's decision to compare an individual's impaired functioning with the functioning of most unimpaired people. For instance, in *Soileau v. Guilford of Maine, Inc.*, 105 F.3d 12 (1st Cir.1997), the First Circuit stated that, "Impairment is to be measured *in relation to normalcy*, or, in any event, to what the *average person* does." *Id.* at 15–16 (emphasis added). Likewise, in the case of *Lillibridge v. Wooden Soldier, Ltd.*, 957 F.Supp. 12 (D.N.H.1997), the court found that an employee who suffered pain from "overuse" of her hands (but not carpal tunnel syndrome) was not "substantially limited" because her

---

**3.** Under the authority given to it by § 12186, the DOJ promulgated regulations on "Nondiscrimination on the Basis of Disability by Public Accommodations and in Commercial Facilities." 28 C.F.R. pt. 36 (1996). The relevant section provides the following:

Any private entity offering an examination covered by this section must assure that—
(I) The examination is selected and administered so as to best ensure that, when the examination is administered to an individual *with a disability* that impairs sensory, manual, or speaking skills, the examination results accurately reflect the individual's aptitude or

achievement level or whatever other factor the examination purports to measure, rather than reflecting the individual's impaired sensory, manual, or speaking skills (except where those skills are the factors that the examination purports to measure).

28 C.F.R. § 36.309 (emphasis added).

**4.** The *Pazer* court noted, however, that such a disparity did not compel the finding as a matter of law: "Indeed, to hold otherwise would compel the conclusion that any underachiever would by definition be learning disabled as a matter of law." *Pazer*, 849 F.Supp. at 287.

unsuitability to " 'strenuous' handwriting required of catalog order taker" was not " 'extraordinary,' *as compared to the average person." Id.* at 12, 16–17 (emphasis added); *see also Nedder v. Rivier College,* 944 F.Supp. 111, 113, 117 (D.N.H.1996) (finding evidence insufficient to support claim by 5′6″, 375 lbs. former assistant professor that she was substantially limited in major activity of walking because she was only "moderately impaired"; she could walk "albeit with considerable exertion and not as swiftly as the *average person*"; and her problems walking on ice, for example, were "no different ... than the average person") (emphasis added) (quoting *Roth v. Lutheran Gen. Hosp.,* 57 F.3d 1446, 1454 n. 12 (7th Cir.1995) and 29 C.F.R. § 1630.2(j)(1)(ii) for proposition that "a substantial impairment is established where the individual is 'either unable to perform, or significantly restricted as to the condition, manner or duration under which the individual can perform, a major life activity *as compared to an average person in the general population'*").

The "comparison to most people" approach has practical advantages as well. Courts are ill-suited for determining whether a particular medical diagnosis is accurate. Courts are better able to determine whether a disability limits an individual's ability in comparison to most people. Additionally, this functional approach is manageable and, over time, will promote a uniform and predictable application of the ADA.

■ Accordingly, this Court concludes that in order for an individual to establish that he or she is "substantially limited" in a major life activity, that person must show a limitation in their ability to perform a life function as compared with most people.

### III. Application of This Rule to the Plaintiffs

■ To determine whether a person has a disability under the ADA, this Court must undertake a two-step analysis. *See Dutcher,* 53 F.3d at 726. First, the person must have an impairment. For certain impairments, such as learning disabilities, the impairment may be medically diagnosed by showing a discrepancy between a person's intellectual capabilities and his or her performance. Second, the person must show that the impairment restricts his or her ability to perform a major life function in comparison to most people.

■ Take, for example, two hypothetical students. Student A has average intellectual capability and an impairment (dyslexia) that limits his ability to learn so that he can only learn as well as ten percent of the population. His ability to learn is substantially impaired because it is limited in comparison to most people. Therefore, Student A has a disability for purposes of the ADA. By contrast, Student B has superior intellectual capability, but her impairment (dyslexia) limits her ability so that she can learn as well as the average person. Her dyslexia qualifies as an impairment. However, Student B's impairment does not substantially limit the major life function of learning, because it does not restrict her ability to learn as compared with most people. Therefore, Student B is not a person with a disability for purposes of the ADA.[5]

The plaintiffs in this case are best compared to Student B: First, each plaintiff has some learning difficulty. Second, each of the students has a history of significant scholastic achievement reflecting a complete absence of any substantial limitation on learning ability. Further, this record of superior performance is corroborated by standardized test scores measuring cognitive ability and performance. Finally, there is a complete

---

5. Plaintiffs' three experts misapprehend the meaning of "disability" within the ADA. Two of the professionals at HELP, and an additional expert testifying on behalf of the plaintiffs, testified to their belief that a person who is not performing up to his or her abilities has a disability within the meaning of the ADA. Dr. Barbara Guyer testified, "The law says that you must look at the discrepancies between their ability and their achievement." Deborah Painter testi-

fied that "the problem that we have with the Board's decision was that they're saying that if an individual's processing is average, there is no problem." Dr. MacCallum gave his opinion in response to a question from plaintiffs' attorney: "Q. The bottom line is what you're saying is that the issue is whether a person can function at the level that person is capable of functioning at. That's your standard, true? A. That's correct."

lack of evidence suggesting that plaintiffs cannot learn at least as well as the average person. That is, these students do not suffer from an impairment which substantially limits the life activity of learning in comparison with most people.

Accordingly, the Court **CONCLUDES** that the plaintiffs do not have a disability as defined under the ADA and are not entitled to the accommodations they seek. The Court therefore **DENIES** plaintiffs' request for relief.

The Court hereby adopts as Conclusions of Law any Findings of Fact more appropriately considered Conclusions of Law and adopts as Findings of Fact any Conclusions of Law more appropriately considered Findings of Fact.

The Court **DENIES** defendant's request for attorney fees and costs.

The Court **ORDERS** that judgment be entered in favor of the defendant and that this matter be stricken from the docket.

The Court **DIRECTS** the Clerk to send a copy of this Order to all counsel of record and any unrepresented parties.