Michael GONZALEZ, Plaintiff,

v.

NATIONAL BOARD OF MEDICAL
EXAMINERS, Defendant.

No. 99–CV–72190–DT.

United States District Court,
E.D. Michigan,
Southern Division.

Aug. 10, 1999.

Richard J. Landau, Jeffrey N. Silveri, Dykema Gossett, Ann Arbor, MI, for Michael Gonzales, plaintiff.

Roy C. Hayes, Roy C. Hayes, III, Hayes Law Firm, Charlevoix, MI, for National Board Medical Examiners, defendant.

## MEMORANDUM OPINION AND ORDER

ZATKOFF, District Judge.

### I. INTRODUCTION

This matter is before the Court on plaintiff's Motion For a Preliminary Injunction. Defendant responded and plaintiff replied. This Court held a hearing during which the Court listened to four days of testimony beginning on Monday June 28, 1999. After considering the testimony and the documentary evidence submitted and for the reasons that follow, plaintiff's motion for a preliminary injunction is DENIED.

## II. BACKGROUND

Plaintiff Michael Gonzales (hereinafter "Gonzalez" or "plaintiff") filed this complaint under Subsection III of the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq. (hereinafter "ADA") after the defendant National Board of Medical Examiners (hereinafter "NBME" or "defendant") twice denied his request for extra time to take Step 1 of the United States Medical Licensing Examination (hereinafter "Step 1 Exam"). Gonzales is a student at the University of Michigan Medical School. Medical school students complete their core classes after two years. In the third year, medical students undertake "rotations" through various medical specialties. In order to continue into the third year of medical school at the University of Michigan, students must pass the Step 1 Exam. Plaintiff successfully completed his first two years of medical school. Plaintiff took the Step 1 Exam twice without accommodation and failed both times.

Plaintiff claims that he has a learning deficiency (Reading Disorder and Disorder of Written Expression) that necessitates additional testing time on the Step 1 Exam. His impairment has been diagnosed by two different clinical psychologists, Dr. Ulrey and Dr. Giordani. Plaintiff sent the diagnoses to the defendant with his request for accommodations. Defendant reviewed the materials, sent them to an outside psychologist for an independent review, and concluded that plaintiff was not disabled under the ADA and therefore not entitled to an accommodation. Plaintiff seeks a preliminary injunction prohibiting the NBME from violating his rights and requiring the NBME to allow Gonzales double time to take the exam.

## III. LAW

### A. PRELIMINARY INJUNCTION

■ The Sixth Circuit has identified four factors as being of special importance in determining whether to issue a preliminary injunction:

(1) the likelihood of plaintiff's success on the merits; (2) whether the injunction will save the plaintiff from irreparable injury; (3) whether the injunction would harm others; and (4) whether the public interest would be served by the injunction.

In re DeLorean Motor Co., 755 F.2d 1223, 1228 (6th Cir.1985) (citations omitted). Under Fed.R.Civ.P. 65, the four factors are "to be balanced and are not prerequisites that must be satisfied." In re Eagle–Picher Industries, Inc., 963 F.2d 855 (6th Cir.1992).

The ADA specifically contemplates that injunctive relief is appropriate to remedy acts of discrimination against persons with disabilities. The ADA incorporates the provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000a–3, which states that whenever a person has engaged, or is about to engage, in a prohibited act, a temporary or permanent injunction is an appropriate remedy for the aggrieved party. 42 U.S.C. § 12188(a)(1); see also D'Amico v. New York State Board of Law Examiners, 813 F.Supp. 217 (W.D.N.Y.1993).

### B. AMERICANS WITH DISABILITIES ACT

Plaintiff brings his lawsuit under Subsection III of the Americans with Disabilities Act (hereinafter "ADA"). 42 U.S.C. § 12189. Subsection III of the ADA states in pertinent part:

Any person that offers examination ... related to applications, licensing, certification, or credentialing for ... professional, or trade purposes shall offer such examinations ... in a place and manner accessible to persons with disabilities or offer alternative accessible arrangements for such individuals.

42 U.S.C. § 12189.

■ The purpose of the ADA is not "to allow individuals to advance to professional positions through a back door. Rather, it is aimed at rebuilding the threshold of a

profession's front door so that capable people with unrelated disabilities are not barred by that threshold alone from entering the front door." *See Price v. National Board of Medical Examiners*, 966 F.Supp. 419, 421–22 (S.D.W.V.1997) (quoting Jamie Katz & Janine Valles, The Americans With Disabilities Act and Professional Licensing, 17 MENTAL & PHYSICAL DISABILITY L.REP. 556, 561 (Sept./Oct. 1993).

■ A person is disabled within the meaning of the ADA if that individual suffers from "a physical or mental impairment that substantially limits one or more of the major life activities of such individual." 42 U.S.C. § 12102(2)(A). A covered entity discriminates against a disabled individual when it fails to make "reasonable accommodations to known physical or mental limitations." 42 U.S.C. § 12112(b)(5)(A). Therefore, to succeed on a ADA claim, plaintiff must demonstrate (1) that he is disabled, (2) that his requests for accommodations are reasonable, and (3) that those requests have been denied.

### IV. ANALYSIS

■ Both parties agree that the ADA applies to the defendant NBME. 42 U.S.C. § 12189. Thus, the principal issue in this case is whether the plaintiff is disabled under the ADA. To determine whether a person has a disability under the ADA, this Court must undertake a two-step analysis. *Dutcher v. Ingalls Shipbuilding*, 53 F.3d 723, 726 (5th Cir.1995). First, the person must have an impairment. *Id.* For certain impairments, such as learning disabilities, the impairment may be medically diagnosed by showing a discrepancy between a person's intellectual capabilities and his performance. Second, the plaintiff must demonstrate that the impairment significantly restricts his ability to perform a major life function. *Id.*

### A. PLAINTIFF'S DIAGNOSES

Plaintiff was first diagnosed with a learning impairment in 1994 by Dr. Ulrey while he was an undergraduate student at University of California at Davis. Dr. Ulrey administered a battery of tests and concluded that plaintiff had "verbal and performance skills ranging from the average to the superior." (Plaintiff's Brief in Support of a Preliminary Injunction, p. 4). However, Dr. Ulrey also found that on one examination, plaintiff scored in the 10th percentile on verbal communication, and in the 18th percentile on reading rate. Therefore, Dr. Ulrey concluded that plaintiff had "an underlying learning disability related to slowness in language processing," and that the pattern of errors made by plaintiff on the different examinations "strongly suggests an underlying processing disorder." *Id.*

In March of 1998, anticipating the completion of his second year of medical school in May, plaintiff requested a test accommodation for the June 1998 Step 1 Exam. Defendant submitted plaintiff's materials to an independent psychologist for review. Upon the recommendation of the independent psychologist, defendant denied plaintiff's request because, according to the NBME, plaintiff did not demonstrate that he was significantly impaired. Plaintiff took the Step 1 Exam in June of 1998 without accommodation and failed to achieve a passing score by four points.

After failing the examination on his first attempt, plaintiff decided to get a second opinion to overcome defendant's concerns that plaintiff lacked the documentation necessary to demonstrate a disability under the ADA. On August 10, 1998, Dr. Bruno Giordani, a psychologist in the Neuropsychology Division of the University of Michigan Hospitals, administered to plaintiff the following assessment procedures through an assistant:

(1) Wechsler Adult Intelligence Scale—Third Edition

(2) Woodcock–Johnson Tests of Achievement—Revised

(3) Woodcock Reading Mastery Tests—Revised, Form G

(4) Nelson–Denny Reading Test

(5) Halstead–Reitan Neuropsychological Test Battery and Allied Procedures

(6) Wechsler Memory Scale—Revised

(7) Test of Variables of Attention

(8) Attentional Capacity Test

(9) Digit Vigilance Test

(10) Minnesota Multiphasic Personality Inventory—2

(11) Patient History

(12) Interview

(Plaintiff's Ex. 20).

Dr. Giordani compared plaintiff's performance to fourth year college students and found that some of his scores were below average to impaired. After analyzing the scores, Dr. Giordani concluded that plaintiff suffered from a Reading Disorder and Disorder of Written Expression. In August of 1998, plaintiff again requested an accommodation from defendant for the October examination and submitted Dr. Giordani's findings. Again, defendant refused. Plaintiff took the October Step 1 Exam without accommodation and again failed to achieve a passing score by four points. Defendant disagrees with Dr. Giordani's analysis and his decision to compare plaintiff's scores with education and age specific norms. Instead, defendant asserts that plaintiff's scores should be compared with a pooled group of individuals who purport to represent the "average" person in society. After comparing plaintiff's scores with pooled norms, defendant argues his test results are in the average to superior range and therefore plaintiff is not disabled under the ADA.

Plaintiff argues that he is disabled under the ADA in his major life activities of reading and learning and that defendant wrongfully denied his request for an accommodation on the Step 1 Exam. As stated above, the ADA requires plaintiff to demonstrate the following: (1) that he is disabled, (2) that his requests for accommodations are reasonable, and (3) that those requests have been denied. Congress defined disability as "a physical or mental impairment that substantially limits one or more of the major life activities of such individual." 42 U.S.C. § 12102(2)(A). Therefore, to state a claim under the ADA, plaintiff must prove that he suffers from a mental or physical impairment and that such impairment substantially limits a major life activity. *Andrews v. State of Ohio*, 104 F.3d 803, 808 (6th Cir.1997).

The ADA does not define the three phrases, "physical or mental impairment," "substantially limits," and "major life activity," which are critical to an understanding of what constitutes a disability under the ADA. For purposes of this motion, defendant concedes that learning and reading are major life activities. (Defendant's Post–Hearing Brief, p. 3, fn. 2). The critical issue in this case is whether plaintiff's claimed impairment "substantially limits" his ability to read and learn. Although the text of the ADA is silent as to the definition of "substantially limits," legislative history and agency regulations provide insight.

### B. LEGISLATIVE HISTORY AND AGENCY REGULATIONS

Legislative history offers some guidance as to the definition of "substantially limits." The report of the Senate Committee on Labor and Human Resources, the congressional committee which developed the ADA structure, notes that substantially limiting impairments cannot be "minor" or "trivial." S.REP. NO. 101–116 (1989). Rather, the impairments must restrict an individual's major life activity as to the "conditions, manner, or duration under which [the activity] can be performed in comparison to *most people*." *Id.* (emphasis added).

The authority to issue regulations to implement the ADA is split primarily among three government agencies. *Sutton*, 119 S.Ct. at 2144. Congress authorized the Equal Employment Opportunity Commission (hereinafter "EEOC") to issue regulations regarding Subchapter I, which governs workplace discrimination. Congress authorized the Attorney General to issue regulations as to Part A of the Sub-

chapter on public services, as well as Subchapter III, which addresses services provided by private entities. *See* 42 U.S.C. §§ 12134, 12186. Finally, Congress authorized the Secretary of Transportation to issue regulations for provisions dealing with public transportation. *See* 42 U.S.C. §§ 12149, 12164; *see also Price*, 966 F.Supp. at 425.

Subchapter III (Section 12189) applies to this case and requires private entities that administer licensing examinations to provide accommodations for disabled persons taking the examination. The Department of Justice (hereinafter "DOJ"), charged with promulgating regulations under Subchapter III, defined "substantially limits" as follows: "when the individual's important life activities are restricted as to the condition, manner, or duration under which they can be performed in comparison to most people." 28 C.F.R. pt. 36, app. B; *Accord* 29 C.F.R. 1630.2(j)(1)(ii). Therefore, in order to determine whether plaintiff is disabled for purposes of the ADA, his abilities must be compared with most people or, in other words, to the average person in the general population. *Price*, 966 F.Supp. at 425.

■ When compared to pooled norms, plaintiffs scores are squarely in the average to superior range. Of the more than twelve tests administered by Dr. Giordani in 1998, plaintiff scored significantly below average in only one, the Digit Span. In the Digit Span test administered by Dr. Giordani in 1998, plaintiff received a score of five, which is significantly below average and borderline impaired. However, plaintiff's score on the 1998 Digit Span test is clearly suspect. In 1994, plaintiff took another Digit Span test with Dr. Ulrey in which he received a tell, well within the average range. (Defendant's Ex. 66). Dr.

Flanagan and Dr. Litchford testified at the hearing that because of the wide discrepancy between the two scores, the Digit Span test is an unreliable indicator of plaintiff's ability.

Although this Court recognizes that Dr. Giordani is a competent and accomplished psychologist, this Court finds the testimony of Dr. Litchford and Dr. Flanagan more persuasive. Both Dr. Lilchford and Dr. Flanagan testified that plaintiff does not have a documented history of academic achievement below expectations that would support a diagnosis of a learning disability. Although significant academic achievement does not negate a student's claim that he has a learning disability, the education history is relevant to the inquiry.[1] Moreover, both Dr. Litchford and Dr. Flanagan testified that Dr. Giordani's diagnosis is not supported by the test results. Plaintiff's performance in both reading and writing tests fell well within the average to superior range when compared to most people. Average, or even slightly below average, is not disabled for purposes of the ADA. *See e.g. Sutton v. United Airlines, Inc.*, 119 S.Ct. at 2147–49.

■ Even though some of plaintiff's test scores are on the low end of the average range, such as his scores on the Woodcock Johnson test, Dr. Litchford stated that "his verbal IQ is within the average range and his auditory memory performances from the Wechsler Memory Scale, although discrepant with his visual memory performances, are still within the average range." (Defendant's Ex. 72). Plaintiff's verbal IQ is 100, squarely in the average range. His performance IQ is 121, in the high average to superior range and his Full Scale IQ is 109, well within the average range. As compared to the general

---

1. Plaintiff graduated from high school with a 4.3 grade point average (5.0 scale) and obtained an A in all the available advanced placement credits. He received a 1050 on the SAT without accommodation. According to the Princeton Review, a 1600 is the highest possible score and 1000 is the approximate average. At the University of California at Davis, he majored in physiology and graduated with a 3.15 (4.0 scale) grade point average. Plaintiff took the MCAT twice, receiving improved scores from the first time to the second time without accommodation. He has no history of accommodations before he entered the University of Michigan.

population, plaintiff's scores are overwhelmingly average to superior. Therefore, plaintiff has not demonstrated that he suffers from an ADA-defined disability which substantially effects a major life activity.

Further, to interpret the ADA otherwise would expand the reach of the ADA beyond that contemplated by Congress. Congress found that "some 43,000,000 Americans have one or more physical or mental disabilities, and this number is increasing as the population as a whole is growing older." 42 U.S.C. § 12101(a)(1). This finding, enacted as part of the ADA, requires the conclusion that Congress did not intend to bring under the statute's protection all those persons whose level of reading or writing falls within the average or slightly below average range. To interpret the ADA's reach as broadly as plaintiff requests would be inconsistent with congressional findings and the purpose of the statute. Had the purpose been to include all individuals who are unable perform at an above-average level in writing or reading tests, Congress undoubtedly would have cited a much higher number of disabled persons. That it did not is evidence that the ADA's coverage is restricted to only those whose learning disability places them significantly below average. *See e.g. Sutton,* 119 S.Ct. at 2147–49.

## C. WORKPLACE DISCRIMINATION (SUBSECTION I)

In the alternative, plaintiff argues that even if this Court determines that plaintiff is not disabled in his major life activities of reading and writing, the Court should analyze this case under Subsection I of the ADA and consider whether plaintiff is disabled in his major life activity of working. The EEOC is charged with promulgating the regulations applicable to Subsection I. Plaintiff contends that when determining whether plaintiff is substantially limited as to the major life activity of working, this Court must compare plaintiff not to the average person, but to the "average person having comparable training, skills, and abilities." 29 C.F.R. 1630.2(j)(3)(i).

Subchapter III, not Subsection I, directly applies to this case and requires private entities that administer licensing examinations to provide accommodations for disabled persons taking the examination. Plaintiff now contends that defendant should be liable under Subchapter I of the ADA, which prohibits workplace discrimination. However, the instant case is not a workplace discrimination case and application of Subchapter I to the facts is problematic. First, in order for plaintiff to establish prima facie case of employment discrimination under ADA, he must show that: (1) he is disabled; (2) he is otherwise qualified for the position with or without reasonable accommodation; (3) he suffered an adverse employment decision; (4) the employer knew or had reason to know of the disability; and (5) the position remained open. 42 U.S.C. § 12101 *et seq.* Plaintiff cannot demonstrate that he is otherwise qualified to be a doctor because he has not graduated from medical school and is not licensed to practice medicine.

More importantly, Subsection I does not apply to the defendant ill this case. "[The ADA, Subsection I] provides that no *covered employer* 'shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to the job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.'" *Sutton,* 119 S.Ct. at 2144 (quoting 42 U.S.C. § 12112(a)) [emphasis added]; *see also* 42 U.S.C. § 12111(2) ("The term 'covered entity' means an employer, employment agency, labor organization, or joint labor-management committee"). The defendant is not employed by or seeking employment with NBME, but is taking the Step 1 examination administered by NBME. Therefore, where the ADA specifically covers NBME as an administrator of licensing examinations under Subchapter III, this Court cannot apply Subchapter I. *Price,* 966 F.Supp. at 426, fn. 2.

 Even assuming that Subchapter I could apply to this case, the EEOC regulations are entirely consistent with the regulations promulgated by the DOJ. The EEOC stated that the term "substantially limits" means:

(i) [u]nable to perform a major life activity that the *average person in the general population* can perform; or

(ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the *average person in the general population* can perform that same major life activity.

29 C.F.R. 1630.2(j)(1)(i–ii) (emphasis added).

In order to support his position that he should be compared to an age and education specific pool of people, plaintiff quotes from the EEOC's definition of "the major life activity of working" as it relates to the class of jobs for which a person is qualified, not to the definition of "substantially limits." *See* 29 C.F.R. 1630.2(j)(3)(i). Notwithstanding plaintiff's argument to the contrary, the EEOC defines "substantially limits" consistently with the DOJ and requires this Court to compare a plaintiff seeking accommodation under the ADA to the average person in the general population. Therefore, plaintiff has not demonstrated that he suffers from a disability that "substantially limits" a major life activity, as the phrase is defined in either the DOJ or EEOC regulations.

## V. CONCLUSION

Plaintiff has not demonstrated that he has a disability that substantially limits a major life activity in comparison to the average person in the general population. Accordingly, because plaintiff has not demonstrated a substantial likelihood of success on the merits, he is not entitled to a preliminary injunction. *See Six Clinics Holding Corp. II v. Cafcomp Systems,* 119 F.3d 393, 399 (6th Cir.1997) (a district court should make specific findings as to each factor unless fewer factors are dispositive of the issue). Having found that plaintiff cannot succeed on the first element of the preliminary injunction analysis, this Court need not address the remaining elements. *Id.* Therefore, plaintiff's motion for a preliminary injunction is DENIED.

IT IS SO ORDERED.