Jonathan LOVE

v.

## LAW SCHOOL ADMISSION COUNCIL, INC.

Civil Action No. 06–CV–3333.

United States District Court, E.D. Pennsylvania.

March 9, 2007.

Charles Weiner, Law Office of Charles Weiner, Doylestown, PA, Joanne Simon, Law Office of Joanne Simon, Brooklyn, NY, Jennifer Weiser, Lisa Margaret Burger, Sid Wolinsky, Berkeley, CA, for Jonathan Love.

Jane E. Leopold–Leventhal, Grace M. Deon, Eastburn & Gray PC, Doylestown, PA, for Law School Admission Council, Inc.

## FINDINGS OF FACT, CONCLUSIONS OF LAW & ORDER

J. SURRICK, District Judge.

On July 7, 2006, Plaintiff Jonathan Love filed a Complaint against Defendant, the

Law School Admissions Council ("LSAC"), alleging that his rights under Title III of the American With Disabilities Act ("ADA"), 42 U.S.C. § 12189,[1] had been violated because he had been denied an accommodation on the Law School Admissions Test ("LSAT"). (Doc. No. 1.) Initially, Plaintiff sought a preliminary injunction ordering LSAC to provide him with time-and-a-half on the LSAT. (Doc. No. 9.) This would have provided Plaintiff with a total of 52.5 minutes on each section of the test instead of the standard thirty-five minutes per section. (Doc. No. 20 at 5.) Prior to the injunction hearing, Plaintiff's counsel withdrew the request for a preliminary injunction and advised that he would proceed to trial on the merits. (Doc. No. 18.)

A bench trial was held from December 18, 2006 through December 22, 2006. Based upon the evidence and testimony presented at trial, we make the following Findings of Fact and Conclusions of Law.

## I. Findings of Fact

Jonathan Love is a twenty-five year-old student presently enrolled in the Master of Business Administration ("MBA") program at the University of Notre Dame. Plaintiff intends to apply for admission to law school for the 2007–2008 academic year. (Doc. No. 1.) Defendant LSAC is a private non-profit entity that administers the LSAT, an exam that is required for admission to all accredited law schools in the United States. (*Id.*) The LSAT is administered four times a year, in February, June, September or October, and December. (*Id.* at 4.)

The LSAT is comprised of six sections that test reading comprehension, critical reasoning, and inferential reasoning. (Tr. 3 at 293 (Dempsey).)[2] Specifically, the LSAT sections consist of one reading comprehension section, two logical reasoning sections, one analytical reasoning section, one writing sample, and one "experimental section" (which can be reading comprehension, analytical or logical reasoning).[3] (*Id.* at 296.)

Plaintiff alleges that he suffers from Attention Deficit Hyperactivity Disorder ("ADHD") Combined Type. He alleges that he also suffers from a learning disability affecting academic fluency and processing speed. (Tr. 1 at 155 (Runyan); Tr. Ex. P–13 ¶ 3 (J. Love Decl.).) Plaintiff first took the LSAT without accommodation in October 2003. (Tr. 1 at 247 (J. Love).) He received a score of 150 (out of a possible 180), a score that fell within the national average range. (Tr. 3 at 260 (Dempsey); Tr. Ex. P–62.) After learning that LSAC offered accommodations on the LSAT, Plaintiff submitted a timely request in October 2003 for an accommodation of extra time on the December 2004 LSAT. (Tr. 1 at 302 (J. Love); Tr. Ex. P–13 ¶ 10

1. 42 U.S.C. § 12189 states in pertinent part: "Any person that offers examinations ... related to applications, licensing, certification, or credentialing for ... professional ... purposes shall offer such examinations ... in a place and manner accessible to persons with disabilities or offer alternative accessible arrangements for such individuals." 42 U.S.C. § 12189.

2. We will refer to the trial transcripts by numbers 1 through 5 as follows with the last name of the witness in parentheses following the citation:

Tr. 1—Dec. 18, 2006 (Doc. No. 57)
Tr. 2—Dec. 19, 2006 (Doc. No. 65)
Tr. 3—Dec. 20, 2006 (Doc. No. 62)
Tr. 4—Dec. 21, 2006 (Doc. No. 63)
Tr. 5—Dec. 22, 2006 (Doc. No. 64)

3. The unscored section is typically used to analyze questions for future exams and varies for different administrations of the test. (Doc. No. 17 at 6.) The 35-minute writing sample is not scored, but sent to all the law schools to which the candidate applies. (*Id.*)

(J. Love Decl.).) Plaintiff's original application requesting accommodations on the LSAT consisted of: (1) a psychological report by Dr. Micheal Davenport, Ph.D., dated July 15, 2000; (2) a neuropsychological/psychoeducational evaluation by Dr. Alice Anne Brunn, Ph.D., dated October 8, 2004; (3) Plaintiff's standardized test score history, including his SAT, ACT and GMAT scores; (4) Plaintiff's Baylor University transcript; and (5) letters from Plaintiff's academic advisor and professors. (Tr. Ex. P–13 ¶ 10 (J. Love Decl.).) On November 3, 2004, Plaintiff received a letter from LSAC denying his request because the documentation provided by Plaintiff did not "demonstrate a substantial limitation related to taking the LSAT." (Doc. No. 20 at 7; Tr. Ex. P–5.) After a series of requests that were subsequently denied, Plaintiff commenced this litigation.

### A. Experts Who Testified at Trial

Dr. M. Kay Runyan, Ph.D. and Dr. Alice Anne Brunn, Ph.D. testified as experts for Plaintiff during the trial.

Dr. Runyan was qualified as an expert in the assessment of learning disabilities and ADHD and the providing of accommodations based on learning disabilities and ADHD. (Tr. 1 at 61 (Runyan).) Dr. Runyan has thirty years of experience in diagnosing and evaluating individuals for learning disabilities and ADHD in school settings. (Tr. 1 at 64–67 (Runyan); Tr. Ex. P–36 (Runyan Curriculum Vitae); Tr. Ex. P–37 ¶ 1 (Runyan Decl.).) She has a Ph.D. in Special Education from the University of California at Berkeley with a focus in learning disabilities and Attention Deficit Disorder ("ADD"), and the assessment and diagnosis of those disorders. (Tr. 1 at 49–50 (Runyan); Tr. Ex. P–36.) Dr. Runyan also has a Master of Arts in Special Education with a focus on learning disabilities and ADD from California State University at Sacramento, and she obtained a Bachelor of Arts in Psychology from California State University at Sacramento. (Tr. 1 at 49–50 (Runyan); Tr. Ex. P–36.) She has worked as a consultant for a number of testing entities and law schools, most notably for Defendant LSAC. (Tr. 1 at 49–50 (Runyan); Tr. Ex. P–36.) Dr. Runyan did not personally evaluate Plaintiff. (Tr. 1 at 128 (Runyan).) She reviewed Plaintiff's documentation for the purpose of determining whether Plaintiff demonstrated the existence of a disability and the need for accommodations. (Tr. 1 at 104–105 (Runyan); Tr. Ex. P–37 ¶ 7 (Runyan Decl.).)

Dr. Brunn is a licensed clinical psychologist in Waco, Texas and was qualified as an expert in the assessment of individuals with disabilities. (Tr. 2 at 255–57 (Brunn); Tr. Ex. P–17 (Brunn Curriculum Vitae).) She has a Masters in General Experimental Psychology and a Ph.D. in Personality Psychology with a minor focus in Educational Psychology from Baylor University. (Tr. 2 at 203–04 (Brunn); Tr. Ex. P–17.) In addition, Dr. Brunn is licensed as a health service provider and as a specialist in school psychology in Texas. (Tr. 2 at 203–04 (Brunn); Tr. Ex. P–17.) Dr. Brunn personally evaluated Plaintiff and administered a battery of tests to him in 2004. (Tr. 2 at 218 (Brunn); Tr. Ex. P–19 (Brunn Evaluation Report).) She diagnosed Plaintiff as having ADHD and a learning disability. (Tr. 2 at 255–57 (Brunn); Tr. Ex. P–19 (Brunn Evaluation Report).)

Dr. Hugh Van Auken did not testify at trial, but he did personally evaluate Plaintiff. (Tr. Ex. P–31 (Van Auken Evaluation Report).) Dr. Van Auken was retained by Plaintiff, but his deposition was offered at trial by Defendant. (Doc. No. 44.) Dr. Van Auken has a Bachelor of Arts in Psychology from Notre Dame University, a

Master of Science in Clinical Psychology from Mississippi State University, and a Ph.D. in Clinical Psychology from St. Louis University. (Tr. Ex. P–28 (Van Auken Curriculum Vitae).) He is licensed in Indiana as a health service provider in psychology. (*Id.*) He has been in private practice since 1989 and has had over fifteen years of experience diagnosing and assessing individuals for learning disabilities and ADHD. (*Id.*)

Dr. Davenport did not testify at trial, but his report was admitted at trial. (Tr. Ex. P–15 (Davenport Evaluation Report).) Dr. Davenport is a licensed psychologist in Shreveport, Louisiana. He is the psychologist who initially diagnosed Plaintiff in 2000 as having ADHD. (Tr. 2 at 140 (M.Love).) He also concluded that Plaintiff did not have a learning disability. (Tr. Ex. P–15 (Davenport Evaluation Report).)

Dr. Kim Dempsey, Dr. Charles Golden, and Dr. Michael Gordon testified at the trial on behalf of LSAC.

Dr. Dempsey has been employed by Defendant LSAC for eleven years and serves as the Disabilities Specialist and Manager of Accommodated Testing. (Tr. 3 at 274–75 (Dempsey); Tr. Ex. P–60 ¶ 1–2 (Dempsey Decl.); Tr. Ex. D–50 (Dempsey Curriculum Vitae).) She has a Bachelor of Science in Psychology, a Masters in Neuro–Psychology from Drexel University and a Ph.D. in Clinical Psychology from LaSalle University. (Tr. 3 at 274–75 (Dempsey); Tr. Ex. P–60 ¶ 1–2 (Dempsey Decl.); Tr. Ex. D–50 (Dempsey Curriculum Vitae).) Her dissertation involved evaluating the LSAT performance of individuals, including those who were denied accommodations and those who received an accommodation, and the effect any additional time had on their performance. (Tr. 3 at 274–75 (Dempsey); Tr. Ex. P–60 ¶ 1–2 (Dempsey Decl.); Tr. Ex. D–50 (Dempsey Curriculum Vitae).) She was qualified as an expert in assessing learning disabilities and ADHD, and determining reasonable accommodations for individuals with learning disabilities and ADHD. (Tr. 3 at 184 (Dempsey).) Within LSAC, Dr. Dempsey is solely responsible for making the decision as to whether an individual qualifies for an accommodation.[4] She is not a licensed psychologist. (Tr. 3 at 274–75 (Dempsey); Tr. Ex. P–60 ¶ 1–2 (Dempsey Decl.); Tr. Ex. D–50 (Dempsey Curriculum Vitae).)

Dr. Golden is a clinical psychologist and professor of psychology at the Nova Southeastern University in Florida and serves as a consultant to LSAC. (Tr. 4 at 211 (Golden); Tr. Ex. D–51 (Golden Curriculum Vitae).) He was qualified at trial as an expert in psychological assessment, clinical neuropsychology, clinical psychology, and psychometrics. (Tr. 4 at 210 (Golden); Tr. Ex. P–67 ¶¶ 2, 3, 5 (Golden Decl.).) Dr. Golden has a Bachelor of Arts in Psychology from Pomona College and Masters and Doctoral degrees in Clinical Psychology from the University of Hawaii in Honolulu. (Tr. 4 at 161–62 (Golden); Tr. Ex. P–67 ¶¶ 2, 3, 5 (Golden Decl.); Tr. Ex. D–51 (Golden Curriculum Vitae).) Dr. Golden is a licensed psychologist in Alabama and Florida and is board certified in clinical psychology, clinical neuropsychology, and psychological assessment. (Tr. 4 at 161–62 (Golden); Tr. Ex. P–67 ¶¶ 2, 3, 5 (Golden Decl.); Tr. Ex. D–51 (Golden Curriculum Vitae).) He has been the recipient of awards from the National Academy of Neuropsychology and served as president of that organization. (Tr. 4 at 161–62

---

4. The absence of a formal appeals process at LSAC is a matter of concern. Although Dr. Dempsey consults with other individuals when a question involving an application for accommodation arises, there is no formal mechanism for an applicant to appeal her findings.

(Golden); Tr. Ex. P–67 ¶¶ 2, 3, 5 (Golden Decl.); Tr. Ex. D–51 (Golden Curriculum Vitae).) Dr. Golden is an independent consultant for LSAC and reviewed Plaintiff's request for accommodations in May 2006 after Dr. Dempsey sent him Plaintiff's file. (Tr. 3 at 236–37 (Dempsey).)

Dr. Gordon is currently the Director of the ADHD program at Upstate Medical University in Syracuse, New York, and a professor in the Department of Psychiatry. (Tr. 5 at 61 (Gordon); Tr. Ex. D–53 (Gordon Curriculum Vitae).) At Upstate Medical University, Dr. Gordon serves as the chief child psychologist, director of the ADHD program, and director of the child clinical internship program. (Tr. 5 at 61 (Gordon); Tr. Ex. D–53 (Gordon Curriculum Vitae).) He has a Bachelor of Arts from Amherst College and a Masters and Ph.D. in Clinical Psychology from Ohio State University. (Tr. 5 at 61 (Gordon); Tr. Ex. D–53 (Gordon Curriculum Vitae).) He completed a clinical internship at Upstate Medical University. (Tr. 5 at 61 (Gordon); Tr. Ex. D–53 (Gordon Curriculum Vitae).) Dr. Gordon also serves as a consultant for LSAC and was also asked by Dr. Dempsey to review Plaintiff's file after this litigation commenced. (Tr. 5 at 61 (Gordon); Tr. Ex. D–53 (Gordon Curriculum Vitae); Tr. Ex. D–54 (Gordon Consulting Agreement with LSAC).) Dr. Gordon was qualified as an expert in the area of ADHD, and to the extent that there is a co-morbidity with learning disabilities, he was qualified as an expert in learning disabilities. (Tr. 5 at 75 (Gordon).)

The psychologists who testified at trial were all advocates for their client's position in this litigation.

## B. Attention Deficit Hyperactivity Disorder

The criteria for diagnosing ADHD are found in the Diagnostic and Statistical Manual of Mental Health Disorders, Fourth Edition ("DSM–IV"). The DSM–IV lists the following diagnostic criteria for Attention Deficit/Hyperactivity Disorder:

Six or more of the following symptoms of inattention have been present for at least 6 months to a point that is disruptive and inappropriate for developmental level:

Inattention

1. Often does not give close attention to details or makes careless mistakes in schoolwork, work, or other activities.

2. Often has trouble keeping attention on tasks or play activities.

3. Often does not seem to listen when spoken to directly.

4. Often does not follow instructions and fails to finish schoolwork, chores, or duties in the workplace (not due to oppositional behavior or failure to understand instructions).

5. Often has trouble organizing activities.

6. Often avoids, dislikes, or doesn't want to do things that take a lot of mental effort for a long period of time (such as schoolwork or homework).

7. Often loses things needed for tasks and activities (e.g. toys, school assignments, pencils, books, or tools).

8. Is often easily distracted.

9. Is often forgetful in daily activities.

Six or more of the following symptoms of hyperactivity-impulsivity have been present for at least 6 months to an extent that is disruptive and inappropriate for developmental level:

Hyperactivity

1. Often fidgets with hands or feet or squirms in seat.

2. Often gets up from seat when remaining in seat is expected.

3. Often runs about or climbs when and where it is not appropriate (adolescents or adults may feel very restless).

4. Often has trouble playing or enjoying leisure activities quietly.

5. Is often "on the go" or often acts as if "driven by a motor."

6. Often talks excessively.

Impulsivity

1. Often blurts out answers before questions have been finished.

2. Often has trouble waiting one's turn.

3. Often interrupts or intrudes on others (e.g., butts into conversations or games).

Some hyperactive-impulsive or inattentive symptoms that caused impairment were present before age 7 years.

Some impairment from the symptoms is present in two or more settings (e.g., at school [or work] and at home).

There must be clear evidence of clinically significant impairment in social, academic or occupational functioning.

(Tr. Ex. D–62; Tr. 1 at 90 (Runyan).) ADHD is a behavioral manifestation of a chemical imbalance in the frontal lobe of the brain created by a decreased blood flow. (Tr. 1 at 87 (Runyan).) As a result, an individual is unable to filter out extraneous distractions, and in many cases, internal distractions as well. (*Id.*) Symptoms of ADHD include a pattern of inattention and impulsivity that is more frequent and more severe than is typically observed in comparable individuals at a similar level of development. (Tr. 1 at 90 (Runyan); Tr. 2 at 252 (Brunn).)

ADHD behavioral symptoms can vary in both extent and type depending on the individual's DSM–IV subtype which include "inattentive type," "hyperactive-impulsive type" and "combined type" (which implicates the symptoms of both subtypes). ADHD is classified as either mild, moderate or severe. (Tr. 2 at 285 (Brunn); Tr. Ex. D–62.) Regardless of the type, however, an individual must demonstrate that the evidence of impairment is clinically significant and that the impairment from the symptoms span two or more settings. (Tr. 2 at 285 (Brunn); Tr. Ex. D–62.) A complete diagnosis requires that a clinician develop a full clinical picture of an individual, which includes following the DSM–IV guidelines, evaluating the candidate's behavior in academic, professional, and social settings, identifying any hereditary patterns in an individual's family, and administering a battery of tests including the Test of Variables of Attention ("TOVA"). (Tr. 1 at 73–75 (Runyan); Tr. Ex. D–36 (Runyan Decl.).)[5] In addition to these mechanisms of diagnosis, a clinician must conduct a "differential diagnosis" to rule out other sources of inattentive or impulsive behavior. (Tr. 5 at 94–96 (Gordon).) Clinicians often misdiagnose ADHD because they fail to deduce or personally observe "clear evidence of clinically significant impairment in social, academic or occupational functioning." (*Id.*)

The effect of ADHD on an individual can be profound. In addition to the significant disruption it can cause to normal childhood development, the educational discrepancy between individuals who have ADHD and those who do not is significant. In the 2003 Census, 25% to 30% of the general

---

**5.** The TOVA is a computer generated test that is designed to identify and quantify inattention and omission. (*Id.*) Other tests that are administered to determine an attention deficit disorder can include the Wechsler Adult Intelligence Scale III ("WAIS–III"). (*Id.*)

population had four-year degrees from undergraduate institutions. (Doc. No. 44–4 at 116–17.) Only 15% to 20% of the population who suffer from ADHD had four-year undergraduate degrees. (*Id.*)

Plaintiff was diagnosed under the DSM–IV guidelines as having ADHD Combined Type. (Tr. Ex. P–13 ¶ 3 (J. Love Decl.); Tr. 2 at 255 (Brunn).) With Combined Type ADHD, one must demonstrate symptoms of both inattention and impulsive hyperactive behavior. (Tr. Ex. D–62; Tr. 1 at 90 (Runyan).) [6]

### C. Plaintiff's Background

Plaintiff was born and raised in Shreveport, Louisiana. (Tr. 1 at 261 (J. Love); Tr. Ex. P–14 ¶ 3 (M. Love Decl.).) His mother and his father divorced when Plaintiff was three years-old and Plaintiff has had little contact with his father since then. (Tr. 1 at 261 (J. Love); Tr. Ex. P–14 ¶ 3 (M. Love Decl.).) Plaintiff has lived with his mother, Margaret Love, and his older sister for most of his life. (Tr. 1 at 261 (J. Love); Tr. Ex. P–14 ¶ 3 (M. Love Decl.).)

Plaintiff's mother, who testified at trial (Tr. 2 at 101 (M.Love)), owns an art gallery in Shreveport along with her brother. (Tr. Ex. P–14 ¶ 3 (M. Love Decl.).) The gallery is called Nader's Gallery. (Tr. 2 at 104 (M.Love).)

#### 1. Plaintiff's Elementary and Secondary Schooling

Plaintiff attended a small private elementary school in Shreveport called St. Joseph's Catholic School. (Tr. 2 at 123 (M.Love); Tr. Ex. P–14; Tr. Ex. D–2.) He attended high school at Loyola College Prep, in Shreveport. (Tr. 2 at 123 (J. Love); Tr. Ex. P–41; Tr. Ex. D–3.)

Plaintiff's kindergarten teacher recommended that he repeat the school year based on her assessment that Plaintiff was "not recognizing letters and numbers like the other students and was not ready to begin reading in first grade." (Tr. 2 at 121–22 (M.Love); Tr. Ex. P–44 (Apple Letter).) However, she also found that he "was never a behavior problem." (Tr. Ex. P–44 (Apple Letter).) Plaintiff was enrolled in kindergarten for five year-olds when he was four. (Tr. Ex. P–14 ¶ 7 (M. Love Decl.).) Because he was "small for his class and slow to learn compared to the other students," it was recommended that he repeat the grade. (*Id.*)

Plaintiff's records from St. Joseph's and two letters from his teachers reference some difficulty with attention, self-control, and reading in the classroom. (Tr. Ex. P–41 (St. Joseph's Progress Report), P–42 (Bergeret Letter), P–43 (Agent Letter).) During one marking period in kindergarten, Plaintiff's self-control, listening skills, and letter recognition skills were rated as "Not Satisfactory." (Tr. Ex. P–41 (St. Joseph's Progress Report).) In the other marking periods, these skills improved and were rated "Satisfactory" or "Outstanding." (*Id.*) His teachers wrote in the "Comments" section of his kindergarten report card that Plaintiff "needs practice with number and alphabet flash cards. We are working on listening and follow[ing] 2 or 3 part instructions." (*Id.*) They also wrote that Plaintiff is "a sweet and caring boy." (*Id.*) Several of Plaintiff's teachers during elementary school provided Plaintiff with informal "accommodations" that involved leniency in allowing him to take extra time on assignments and exams. (Tr. 1 at 268–69 (J. Love); Tr. Ex. P–45 (Colbert Letter); Tr. Ex. P–76 (Rambin Letter); Tr. Ex. P–75 (Buck Letter).) Alvina Buck, Plaintiff's first grade

---

**6.** Dr. Runyan characterized Plaintiff's ADHD as severe.

teacher, recalled in a letter to Dr. Brunn that Plaintiff had difficulty adjusting to first grade and required additional time in order to steadily progress throughout the transition of a new teacher and a new routine. (Tr. Ex. P–75 (Buck Letter).) She also recalled that Plaintiff's reading comprehension skills developed only after he "read[ ] the material several times." (*Id.*) Buck provided Plaintiff with preferential seating in order to "keep him focused and to allow me to keep an eye on his development of reading and writing from left to right." (*Id.*) She specifically sought to maintain an environment with minimal distractions in order to help Plaintiff focus at any given task that was before him. (*Id.*) Nevertheless, Plaintiff's report cards from the first grade through the fourth grade list Plaintiff as a student who "Listens Attentively," "Completes Work In A Reasonable Time," and "Understands And Follows Directions." (Tr. Ex. D–82–84 (St. Joseph's Report Cards).) Plaintiff consistently received "As" and "Bs" throughout the first and second grades, and his performance throughout elementary school as reflected in the Progress Reports was equally satisfactory. (Tr. Ex. P–41; Tr. Ex. D–2.)

Informal "accommodations" were also available to Plaintiff in high school. There were occasions when teachers at Loyola Prep would allow students to remain in the classroom even when the class had ended or permit them to come back later in the day to complete an exam. (Tr. 1 at 13–14 (J. Love); Tr. Ex. P–77 (LeBlanc Letter).) Plaintiff's religion teacher, Sister Sharon Rambin, taught Plaintiff in the ninth grade and identified him as a "daydreamer." (Tr. Ex. P–76.) She described him as someone who "frequently had difficulty focusing in class and was easily distracted." (*Id.*) Sister Rambin suggested in her letter to Dr. Brunn that it was her personal policy to allow all students extra time on exams. (*Id.*) Plaintiff did very well in his religion classes, achieving mostly "As" with two "Bs" over the course of his entire high school career. (Tr. Ex. D–4.) Loyola Prep's Vice Principal, John LeBlanc, advised that, "the general practice of most of the teachers in the school, including myself, was to allow students to take as long as they needed on exams." (Tr. Ex. P–77.) Plaintiff, however, did not take advantage of every opportunity to receive an accommodation for his exams in high school. (Doc. No. 46 at 11–13.) Mr. Brantley Anderson, Plaintiff's criminal and constitutional law teacher in twelfth grade, testified that although he allowed students extra time to complete exams, Plaintiff did not request additional time to complete any of his exams in that class. (*Id.*) Plaintiff received an "A" in Anderson's class. (Tr. Ex. D–3.) LeBlanc also indicated that there were teachers who were strict about the timing of their exams. (*Id.*) For example, in Plaintiff's English class during the first semester of his senior year, he was asked to read several classics including, *The Iliad, Macbeth,* portions of *The Canterbury Tales, Beowulf, Hamlet* and poems from Tennyson and Keats. (Tr. 2 at 69 (J. Love).) Plaintiff's English teacher did not allow Plaintiff to take additional time on any of the twelve to fifteen tests that she gave throughout the course of the year. (*Id.*) Plaintiff received a "B" in this English course without any accommodation. (Tr. 2 at 56 (J. Love); Doc. No. 45 at 12–13.)

Plaintiff's mother testified that when Plaintiff was studying at home during elementary school and high school, she would ensure that he was in his room with the blinds closed and without any outside distractions. (Tr. 2 at 83–84 (M.Love); Tr. Ex. P–14 ¶¶ 11–12 (M. Love Decl.).) She further stated that although she is a single mother, she worked closely with Plaintiff

and his teachers to ensure his continued progress and success in school. (Tr. 2 at 83–84 (M.Love); Tr. Ex. P–14 ¶¶ 11–12 (M. Love Decl.).) Buck, in her letter to Dr. Brunn, stated that she regularly consulted with Plaintiff's mother about the ways in which Plaintiff could improve his academic performance. (Tr. Ex. P–75.) Despite any difficulties that Plaintiff may have encountered, he nevertheless graduated from high school on-time and completed all of the required course work. (Tr. Ex. D–3.)

In high school, Plaintiff took the SAT twice. (Tr. Ex. D–93 (SAT & ACT Report); Tr. Ex. P–11.) In November 1999, he received a 510 in verbal and a 570 in math, for a total of 1080 out of a possible 1600. (Tr. Ex. D–93 (SAT & ACT Report); Tr. Ex. P–11.) Plaintiff's verbal score was in the 50th percentile and his math score was in the 68th percentile. (Tr. Ex. D–93 (SAT & ACT Report); Tr. Ex. P–11.) In January 2000, he again took the SAT and scored a 480 in verbal and a 540 in math, for a total of 1020. (Tr. Ex. D–93 (SAT & ACT Report); Tr. Ex. P–11.) His verbal score was in the 39th percentile and his math was in the 59th percentile. (Tr. Ex. D–93 (SAT & ACT Report); Tr. Ex. P–11.) Plaintiff took the ACT three times. (Tr. Ex. D–93 (SAT & ACT Report); Tr. Ex. P–11.) The first time he scored a 23 in English, a 21 in Mathematics, and a 20 in Reading, for a score that was in the 56th percentile. (Tr. Ex. D–93 (SAT & ACT Report); Tr. Ex. P–11.) The second time he took the test, in June 1999, he received a 23 in English, a 23 in Mathematics and a 21 in Reading for a score that was in the 63rd percentile. (Tr. Ex. D–93 (SAT & ACT Report); Tr. Ex. P–11.) In the final ACT that Plaintiff took, he received a 21 in English, a 21 in Mathematics and a 17 in Reading for a score in the 56th percentile. (Tr. Ex. D–93 (SAT & ACT Report); Tr. Ex. P–11.)

All of Plaintiff's SAT and ACT scores were considered to be within the average range. (Tr. Ex. D–93 (SAT & ACT Report); Tr. Ex. P–11.) Plaintiff took all of these tests without accommodation. (Tr. Ex. D–93 (SAT & ACT Report); Tr. Ex. P–11.)

Although he had some difficulty with his assigned reading and periodically received informal accommodations, Plaintiff did not identify a period when he had substantial difficulties completing his high school work because of disruptions stemming from ADHD. Plaintiff graduated from Loyola Prep with a GPA of 3.16 and a class rank of 39 out of a class of 82 students. (Tr. Ex. D–3.) He took what appears to be standard college preparatory courses at Loyola, which included American History, World History, Civics, English, Biology, Chemistry, Spanish, Religion, Speech, Algebra and Pre–Calculus. (Tr. Ex. D–3.)

Plaintiff was successful outside of the classroom as well. He was popular and had little difficulty engaging in activities that required focus and appropriate social behavior. He was also a successful athlete. (Tr. 2 at 44–46 (J. Love); Tr. Ex. D–8 (Notre Dame MBA App.).) Plaintiff was captain of his high school football team. (Tr. 2 at 44–46 (J. Love); Tr. Ex. D–8 (Notre Dame MBA App.).) He was the starting fullback on offense, the starting outside linebacker on defense, and was on both the punting team and the kickoff team in his senior year. (Tr. 2 at 46 (J. Love).) He also played on his high school's baseball team where he was the starting center fielder. (Id. at 45 (J. Love).) Plaintiff's participation in athletics required that he memorize as many as twenty different offensive plays in football and a number of hand-signals in baseball. (Id. at 48 (J. Love).) As a result of Plaintiff's athletic skills in both football and baseball, he was on the field almost the entire game which required him to focus

and perform specific tasks. (*Id.* at 48 (J. Love).) His talents, particularly in football, won him the "All District Honorable Mention Award" during his senior year of high school. (*Id.* at 96–97 (J. Love).)

### 2. Plaintiff's Undergraduate Education

After graduating from Loyola Prep in 2000, Plaintiff attended Baylor University in Waco, Texas. He graduated from Baylor in 2004. (Tr. Ex. D–4 (Baylor U. Tr.).) Plaintiff testified that while at Baylor he studied in isolated areas where there were fewer distractions and regularly stayed up past midnight in order to complete his homework. (Tr. 1 at 274–75 (J. Love); Tr. Ex. P–13 ¶ 4 (J. Love Decl.).) However, Plaintiff never registered with Baylor's Office of Access and Learning Accommodations. (Tr. 1 at 278 (J. Love); Tr. Ex. P–13 ¶ 5 (J. Love Decl.).) In fact, Plaintiff admitted that when he learned of the formal accommodations process at Baylor, he opted not to register with the accommodations office because his professors provided informal accommodations when he needed them. (Tr. Ex. P–13 ¶ 5 (J. Love Decl.).) He also indicated that he enrolled in courses that were not reading intensive. (Tr. 1 at 278 (J. Love); Tr. Ex. P–13 ¶ 5 (J. Love Decl.).) However, a review of Plaintiff's courses at Baylor reveals that his course load included such courses as American Constitutional Development, Introduction to Sociology, English–Thinking, Writing and Research, Health and Human Behavior, Principals of Marketing and Finance, and the Legal Environment of Business. (Tr. Ex. D–4.) In an admissions essay to New York University's MBA program, Plaintiff characterized his curriculum at Baylor as "rigorous." (Tr. 2 at 30 (J. Love).) A review of the courses that Plaintiff took at Baylor confirms that this is an accurate characterization. (Tr. Ex. D–4.) Plaintiff did well at Baylor without

formal accommodations. (*Id.*) Moreover, Plaintiff did not always seek informal accommodations. For example, Plaintiff took a real estate course from Professor Charles Delaney. Plaintiff never requested any accommodation from Professor Delaney. (Doc. No. 47 at 9–10.) Plaintiff received a "B +" in Dr. Delaney's real estate course in Spring 2003. (Tr. Ex. D–4.) Any informal accommodations that Plaintiff received at Baylor were the result of individual professors allowing Plaintiff extra time on his exams. (Tr. Ex. P–48 (Wood Letter, Stephens Letter, Fuller Letter).) Plaintiff's academic advisor at Baylor submitted a letter supporting Plaintiff's request for an accommodation on the LSAT advising that "several of [Plaintiff's] professors allowed him to take additional time completing his examinations." (Tr. Ex. P–48.)

While a full-time student at Baylor, Plaintiff participated in intramural football, softball, soccer, and basketball. (Tr. Ex. D–8 (Notre Dame MBA App.).) He also served as the Vice President and Secretary of his fraternity. (*Id.*) Plaintiff graduated from Baylor in four years, obtaining a degree in Finance and Real Estate from the Business School. (Tr. Ex. D–4 (Baylor U. Tr.).) He graduated from Baylor with a GPA of 3.2 out of 4.0. (Tr. 1 at 274 (J. Love); Tr. Ex. D–4 (Baylor U. Tr.).)

### 3. Plaintiff's Graduate School Application and Education

In his senior year at Baylor, Plaintiff applied to several MBA programs. (Tr. Ex. D–8 (Notre Dame MBA App.).) On his application to Notre Dame, Plaintiff presented himself as a full-time employee of Nader's Gallery between August 2002 and March 2005. (Tr. 1 at 299 (J. Love); Tr. Ex. D–8 (Notre Dame MBA App.).) He also indicated that he was receiving a

salary from Nader's Gallery of between $30,000 and $40,000 per year and a $3,000 bonus. (Tr. 1 at 299 (J. Love); Tr. Ex. D–8 (Notre Dame MBA App.).) Plaintiff was not working full-time at Nader's Gallery during this period of time and was not receiving a salary or a bonus. (Tr. 1 at 242–43 (J. Love); Tr. Ex. D–8 (Notre Dame MBA App.).) During the time in which he was purportedly working full-time at Nader's Gallery, Plaintiff was a full-time student at Baylor University. (Tr. 1 at 242–43 (J. Love); Tr. Ex. D–8 (Notre Dame MBA App.).) In addition, during his time at Baylor, Plaintiff studied abroad and did an internship on Capitol Hill. (Tr. 1 at 354 (J. Love); Tr. Ex. D–4 (Baylor U. Tr.); Tr. Ex. D–13 (Employment Rec.).) Moreover, Plaintiff spent a significant amount of time in the fall of 2004 studying for the GMAT,[7] the LSAT, and the Texas and Louisiana Real Estate Examinations. (Tr. 1 at 365 (J. Love).) With regard to his supposed salary, Plaintiff explained that while he never made a salary, he was attempting to place a monetary value on the work that he had done on the Nader's Gallery website. (Tr. 1 at 299 (J. Love).)[8]

On the application to Notre Dame, Ms. Love served as a reference for her son as the co-owner of Nader's Gallery. (Tr. 2 at 157 (M.Love); Tr. Ex. D–8.) She submitted an "Employer's Recommendation" form on behalf of her son to Notre Dame, but failed to disclose her relationship as Plaintiff's mother. (Tr. 2 at 157 (M.Love); Tr. Ex. D–8.) She signed the form as "Margaret Nader" and represented that she was Plaintiff's employer who was evaluating him on his performance at the gallery in the context of an employer-employee relationship. (Tr. 2 at 157 (M.Love); Tr. Ex. D–8.) In her day-to-day activities, Ms. Love refers to herself as Margaret Love, not Margaret Nader. Her driver's license reflects her married and legal name, Margaret Nader Love. (Tr. 2 at 156 (M.Love); Tr. Ex. D–74.) She has a checking account under the name of "Margaret Love" and she files her tax return using "Love" as her last name. (Tr. 2 at 193–94 (M.Love).) Finally, her business card identifies her as "Margaret Nader Love." (Tr. Ex. D–75.)

Plaintiff enrolled in the MBA program at the University of Notre Dame in September 2005. (Tr. 1 at 289–90 (J. Love); Tr. Ex. D–8.) As with his experience at Baylor, Plaintiff did not seek formal accommodations at Notre Dame. (Tr. 1 at 288–89 (J. Love); Tr. Ex. P–13 ¶ 5 (J. Love Decl.).) He testified that he sought to take classes that combine class participation, team projects, and individual presentations. (Tr. 1 at 288–89 (J. Love); Tr. Ex. P–13 ¶ 5 (J. Love Decl.).) In the summer of 2006, Plaintiff served as a visiting lecturer at the University of the West Indies on behalf of Notre Dame's Department of Management Studies. (Tr. Ex. D–11.) During that summer, he and two other MBA students lectured at the University of the West Indies's summer program in a course entitled "Entrepreneurship and New Venture Creation." (*Id.*)

---

**7.** Plaintiff took the GMAT with and without accommodation. Plaintiff's score on the GMAT with accommodation was significantly higher than his score without accommodation. There are, however, significant differences between the GMAT and the LSAT. In any event, the research indicates that if you give someone extra time on a timed test like the GMAT or the LSAT, their score will improve whether they have a learning disability or not. (Tr. 4 at 334–335 (Gordon).)

**8.** Plaintiff testified: "I wasn't receiving thirty thousand dollars or forty thousand dollars at any time, so no, it was not factually correct.... I just figured that was the best way for me to let the school know the value of the work I was doing." (*Id.*)

Plaintiff has not yet completed his course work at Notre Dame, but expects to graduate in the spring of 2007. (*Id.*) No evidence was offered suggesting that Plaintiff has had academic problems with the MBA program at Notre Dame.

### 4. Plaintiff's Application to Law Schools

After taking the LSAT without accommodation, Plaintiff applied to law schools in the fall of 2004. He first took the LSAT in October 2003 without an accommodation. (Tr. Ex. P–13 ¶ 9 (J. Love Decl.).) With his LSAT score of 150, he was admitted to four law schools. (Tr. Ex. D–40.) Those schools are Regent Law School, Thomas Jefferson Law School, Florida Coastal Law School, and Mississippi College Law School. (*Id.*) Plaintiff testified that he did not believe that the law schools to which he was accepted were "in line" with his other academic credentials. (Tr. 1 at 257 (J. Love).)[9] In an application to Loyola Law School, Plaintiff described himself as someone who could "stay focused on the task at hand." (Tr. 2 at 32–33 (J. Love); Tr. Ex. D–101.) He also indicated that his "commitment to complete a task or project has never been compromised by distractions or disadvantages that might inhibit the entailment of my goals." (Tr. 2 at 32–33 (J. Love); Tr. Ex. D–101.) ADHD Combined Type is, in fact, a disorder that involves significant problems with distraction and an inability to stay focused.

Plaintiff suggests that his LSAT score without an accommodation is not a reflection of his true potential because he has difficulty reading and guessed on over 50% of the questions on the exam. (Tr. 1 at 305 (J. Love); Tr. Ex. P–13 ¶ 6 (J. Love Decl.).)[10] It is statistically unlikely that Plaintiff guessed on half of the exam. (Tr. 4 at 231–32 (Golden).) When people guess on exams, there is a pattern. They typically guess toward the end of the exam, when they are running out of time. (Tr. 4 at 222 (Golden).) The fact that someone is guessing at the end of the exam is reflected in the number they get wrong at the end.[11] (*Id.*) Plaintiff's scores at the end did not substantially differ from those at the beginning. (*Id.*) Plaintiff scored within the average range throughout each of the four separate sections of the LSAT when he took the test without an accommodation. (Tr. 3 at 298–99 (Dempsey).) In the first section, analytical reasoning, he answered thirteen questions correctly

**9.** Plaintiff testified:

> The schools I was accepted to, I—I read one of those magazines that were—that ranked different law schools in the country, and the few schools I was accepted to ranked in the fourth tier, almost at the bottom of the rankings, and I didn't feel—I didn't feel it was in line with my education, you know, and I felt that, you know, if I was to get accommodations on the LSAT, I could do much better and get into [a] very good law school.

(Tr. 1 at 257 (J. Love).)

**10.** Only seventy-five percent (75%) of the people taking the LSAT will finish it. Twenty-five percent (25%) will not. There is no penalty for guessing on the LSAT. (Tr. 3 at 308.)

**11.** Dr. Golden testified:

> When people guess, they try to do the items at the beginning of the test, and when they start running out of time they guess on the remaining items even if there's not a particular pattern to it. So if you compare their performance on the first ten items versus their performance on the last ten items of each of the scales, you usually see on the first ten items they get much better scores than they do on the last ten. In his case there wasn't—he misses ... seventeen on the first ten and then sixteen on the second ten, or it may be the exact reverse of that ... but in either case there wasn't a difference.

(Tr. 4 at 222 (Golden).)

out of twenty-four. (*Id.*) The mean score for this section was 12.72. (*Id.*) In the next section, logical reasoning, he answered fourteen out of twenty-five questions correctly. (*Id.*) The mean score for this section was 15.49. (*Id.*) In the reading comprehension section, he answered sixteen out of twenty-six questions correctly. (*Id.*) The mean score for this section was a 17.01. (*Id.*) In the final section, which was an additional logical reasoning section, Plaintiff again scored within the median range when he answered seventeen out of twenty-six questions correctly. The mean score on the section was a 16.28. (*Id.*)

### D. Plaintiff's Diagnostic Evaluation—Dr. Micheal Davenport

In July 2000, just prior to Plaintiff's start at Baylor University, Plaintiff and his mother scheduled an evaluation of Plaintiff with Dr. Micheal Davenport. (Tr. 2 at 140 (M.Love).) Plaintiff and his mother were prompted to seek this evaluation because Ms. Love believed that Plaintiff was exhibiting symptoms similar to those demonstrated by his sister, who had been diagnosed by Dr. Davenport as having ADHD. (*Id.*) Ms. Love believed that Plaintiff could benefit from the same medication that his sister had been taking, Adderall. (*Id.*) Plaintiff testified that prior to seeing Dr. Davenport he would often take the Adde-

rall that was prescribed for his sister. (Tr. 2 at 44 (J. Love).)

Dr. Davenport met with Plaintiff and administered only a few diagnostic tests. Specifically, Dr. Davenport administered subtests of the Woodcock Johnson, none of which were timed, and the TOVA. (Tr. 1 at 127 (Runyan); Tr. Ex. D–1.) Dr. Davenport evaluated Plaintiff and determined that Plaintiff had difficulty with information processing, which was disrupted by inattention, impulsivity, and response inconsistency. (Tr. Ex. P–15.) Dr. Davenport was the first psychologist to diagnose Plaintiff with ADHD. (*Id.*) However, Dr. Davenport ruled out the possibility of a learning disability. (*Id.*)

Plaintiff testified that Dr. Davenport prescribed Adderall to treat his ADHD. (Tr. 1 at 355 (J. Love).) Dr. Davenport is a Ph.D., not a medical doctor, and is not legally permitted to prescribe medication.[12] (*Id.*) When confronted with this fact, Plaintiff could not name any other doctor who may have prescribed the Adderall. (*Id.*) He also could not remember the name of the pharmacy where he filled the Adderall prescription. (*Id.*) Plaintiff's mother testified that perhaps it was Plaintiff's pediatrician, Dr. Norman Winterton, who initially prescribed the Adderall. (Tr. 2 at 180 (M. Love).) [13]

---

**12.** We take judicial notice of the fact that in order to prescribe medication, an individual must have a medical license. *See* La.Rev. Stat. Ann. § 37:1202(A)(3) (1999); Fed. R.Evid. 201(b) (providing that "[a] judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.").

**13.** Ms. Love testified: "It probably was his pediatrician who was Dr. Norman Winterton.

He—or it could have been—I mean, I don't remember if Dr. Davenport prescribed it. I don't think he could write prescriptions." (Tr. 2 at 191–92 (M. Love). Despite the existence of a sequestration order, Ms. Love conferred with her son after the first day of the trial on this subject, after Defense counsel had cross-examined the Plaintiff concerning the name of the initial prescribing physician. (Tr. 2 at 191–92 (M. Love)) ("I talked to Jonathan about it briefly. . . . He was just trying to remember who wrote the prescriptions. I mean, it's been a long time and all I—it was either Dr. Davenport or Dr. Winterton.").)

Plaintiff visited several health clinics and doctors during his undergraduate and graduate years and on each occasion, he was asked if he was taking medications. On each occasion Plaintiff failed to inform the doctor that he was taking Adderall. (*Id.*) Plaintiff went to Baylor's Health Clinic on May 7, 2004 and informed the nurse prior to meeting with the doctor that he was not taking any medications. (Tr. Ex. D–21.) When Plaintiff was treated by his personal physician on June 30, 2005, he did not tell him that he was taking Adderall. (Tr. 1 at 335 (J. Love); Tr. Ex. D–21.) Plaintiff went to an endocrinologist, Dr. Thomas Worgul, on July 12, 2005, and did not tell Dr. Worgul that he was taking Adderall. (Tr. 1 at 337 (J. Love); Tr. Ex. D–22.) Plaintiff went to the Notre Dame Health Clinic on January 27, 2006, and again, did not tell anyone at the clinic that he was taking Adderall. (Tr. 1 at 338 (J. Love); Tr. Ex. D–23.) Plaintiff testified that because he did not think that the Adderall was related to his doctor visits, he did not feel compelled to disclose to the doctors that he was taking the medication even though asked. (Tr. 1 at 334–38 (J. Love).)

### E. Plaintiff's Learning Disability

An individual with a learning disability processes information differently from a non-disabled person. (Tr. 1 at 77 (Runyan).) Learning disabilities stem from psychological disorders, the diagnosis of which typically requires a clinician to administer a battery of diagnostic tests. (Tr. 1 at 79 (Runyan).) The diagnosis is based on discrepancies between measures of aptitude, which can be measured by intelligence tests such as the WAIS–III, and measures of achievement, like those assessed and quantified by the Woodcock–Johnson ("WJ–III") and the Nelson Denny Reading Test ("NDRT"). (Doc. No. 44–1 at 39.) LSAC requires the NDRT for purposes of evaluating and diagnosing a learning disability, but clinicians have found that the test cannot stand alone as a singular test in establishing the presence of a learning disability in a particular individual. (*Id.*) These tests utilize cognitive measures to determine an individual's intelligence and whether there is a clinically significant discrepancy between the aptitude and achievement levels. (Tr. 1 at 79 (Runyan).) LSAC requires that in order to receive an accommodation for the LSAT, an individual must demonstrate that there is at least a 1.5 standard deviation between one's cognitive abilities and the area of achievement at issue. (Tr. 1 at 64–65 (Runyan).) Learning disabilities are typically life-long disabilities and do not manifest themselves later on in a person's life. (*Id.*)

Plaintiff was diagnosed with a learning disability for the first time in 2004 when Dr. Brunn evaluated Plaintiff for the purpose of securing an accommodation on the LSAT and the GMAT. (Tr. Ex. D–1.) During her evaluation, Dr. Brunn determined that Plaintiff has a processing speed disorder. (*Id.*) Although the DSM–IV does not have an explicit designation for a processing speed disorder, Dr. Brunn identified Plaintiff as having what the DSM–IV terms a "learning disorder NOS" or "not otherwise specified." (Tr. Ex. D–46; Doc. No. 44–3 at 58.) Processing speed can be defined and identified in a variety of ways. (Tr. 1 at 77, 113 (Runyan); Doc. 44–3 at 59.) Within the clinical community, processing speed may be measured by how quickly one can process novel information such as written symbols, or by "general psychomotor slowness," or by the speed with which an individual can perform "pencil and paper tasks." (Doc. No. 44–3 at 59.) A low processing speed score can be attributed to a reading disorder process or an ADHD process. (Doc. No. 44–3 at 59.)

If a person has a significant discrepancy linked to processing speed, he or she is likely to read slowly. (Tr. 1 at 77, 113 (Runyan); Tr. 2 at 326 (Brunn); Doc. No. 44–1 at 45.) A processing deficit is a barrier that prevents an individual from reading normally. (Tr. 1 at 63 (Runyan).) Individuals who have a processing disorder are what Dr. Runyan refers to as "one word at a time reader[s]" who are so deliberative in their reading that they often must re-read in an effort to comprehend text because of how slowly they read. (*Id.*) In addition, individuals with processing problems often have "faulty reverse sweep" which, Dr. Runyan explained, is where an individual will reach the end of a sentence in a reading passage and realize he or she is reading on the wrong line, so he or she will have to adjust and take time to revert to the correct line. (Tr. 1 at 77 (Runyan).) Reading disorders typically emerge by the time a person is in fourth grade. (Tr. 3 at 294 (Dempsey).)

### F. Plaintiff's Subsequent Diagnostic Evaluations for Accommodations

Drs. Brunn and Van Auken observed Plaintiff reading and observed any difficulty that he had in processing reading passages. They also relied heavily on Plaintiff's self-reporting. LSAC's experts did not personally evaluate Plaintiff and observe his reading or processing skills, but rather examined Plaintiff's test scores. Dr. Runyan stressed the importance of the clinical observations of an individual as critical in the assessment of a learning disability.[14] Dr. Van Auken echoed those views. (Doc. No. 44–3 at 95.) There are, however, problems with relying on self-reporting to make an assessment.

### 1. Plaintiff's Self–Reporting

Dr. Brunn and Dr. Van Auken met with Plaintiff and administered tests to him for the specific purpose of determining the need for accommodation on the LSAT. Over the course of the diagnostic testing, Plaintiff's experts relied on extensive self-reporting by the Plaintiff and his mother. Both Plaintiff and his mother reported that Plaintiff received extensive informal accommodations, and tutoring from elementary school through college. (Doc. No. 44–1 at 25–28; Tr. 3 at 184–86 (Brunn).) When Dr. Brunn authored her report, she was not aware of the fact that Plaintiff's elementary school grades and IOWA Reading test scores were all within the average range. (Tr. 3 at 184–85 (Brunn).) She did not know that he studied for and passed the Texas and Louisiana real estate licensing exams in the fall of 2004 without accommodation. (Tr. 2 at 82 (J. Love); Tr. 3 at 184–85 (Brunn).) She did not know that Plaintiff sat for a full day of interviews with two brokerage houses and received job offers as a result of those interviews. (Tr. 3 at 182, 187 (Brunn).) She did not know that he served as a teaching assistant for a graduate course in entrepreneurship in the West Indies during the summer of 2006. (*Id.* at 185.) Dr. Brunn admitted that she relied upon self-reports that Plaintiff's uncle had been diagnosed with ADHD. (*Id.* at 186–87.) In fact, Plaintiff's uncle has not been formally diagnosed with ADHD. (Tr. 2 at 8 (J. Love).)

When Dr. Van Auken evaluated Plaintiff, he requested that Ms. Love complete a childhood history checklist that served as a behavioral history. (Tr. 2 at 172–73

---

**14.** Dr. Runyan testified that a clinician can "hear that person read and really observe how that person is doing things, not just reporting a test score.... [A] piece of paper isn't going to tell you what was observed in that situation with the client." (Tr. 1 at 65–66.)

(M.Love); Tr. Ex. D–1.) On the checklist, Ms. Love indicated that Plaintiff had "achieved all developmental milestones within normal time limits" and had no difficulty developing and maintaining friendships with other children. (Tr. 2 at 172–73 (M.Love).) Dr. Van Auken did not have the benefit of Plaintiff's full academic history and transcripts when he wrote his reports and made his assessment of Plaintiff. (Doc. No. 44–2 at 25.)

Plaintiff's psychologists relied on self-reporting as well as clinical observation in reaching their conclusions. In this regard, there is some question as to the reliability of some of the information provided. The evidence in this case concerning the prescribing and use of the medication Adderall is perplexing. Moreover, the testimony concerning Plaintiff's application to graduate school demonstrates a willingness to exaggerate to the point of misrepresentation.

### 2. Plaintiff's Diagnostic Testing

The battery of tests that Plaintiff completed in his clinical evaluation with Dr. Brunn included the IVA Continuous Performance Test ("IVA"), the WAIS–III, the WJ–III, and the NDRT, along with several questionnaires that included the Life History Questionnaire, the Beck Depression Inventory, and the Adult Self–Report Scale Symptom Checklist. (Tr. Ex. P–19.)

Dr. Van Auken's assessment was largely confined to the NDRT, the Minnesota Multiphasic Personality Inventory, and the checklist that Ms. Love submitted. (Doc. No. 44–1 at 26; Tr. Ex. D–1.) Plaintiff advised Dr. Van Auken that he simply

wanted to take the NDRT medicated in order to qualify for an accommodation on the LSAT. (Doc. No. 44–1 at 26.) Plaintiff insisted that Dr. Van Auken's clinical evaluation be expedited despite Dr. Van Auken's reluctance to rush the process.[15] (Id.) During Dr. Van Auken's assessment, Plaintiff was clinically evaluated, re-took the NDRT, and sat for the Minnesota Multiphasic Personality Inventory test, in order to rule out alternative psychiatric explanations for his symptoms. (Id. at 29.)

### 3. Plaintiff's Scores

The IOWA Reading Test is a strictly timed exam similar to the NDRT in terms of its vocabulary and reading comprehension sections. It is given to students in the third through the eighth grade. On the IOWA Reading Test, for each of the school years three through eight, Plaintiff scored in the average or above average range. (Tr. 4 at 251 (Golden).)

On the WJ–III, a score is compiled from two sub-tests that are un-timed and consist of reading comprehension and letter word identification. (Tr. 1 at 109, 118, 119 (Runyan); Tr. 2 at 338–39 (Brunn).) Plaintiff scored in the average range in the broad reading cluster. (Id.) On academic fluency, which consists of three timed sub-tests (reading, writing, and math fluency), Plaintiff scored in the ninth percentile, which is well below average. (Id.)

Plaintiff took the NDRT, a timed reading measure, once with Dr. Brunn in 2004 without medication, and once with Dr. Van Auken in 2006 with medication. (Tr. Ex. D–1 (Van Auken Evaluation Report); Tr. Ex. P–19 (Brunn Evaluation Report).)

---

**15.** Dr. Van Auken testified in this regard as follows: "[Plaintiff's] presentation specifically to me was, I just want to take the Nelson–Denny medicated. In his consultation with [Brunn], he had not taken it medicated. His presentation specifically to me was, I just want to take the Nelson–Denny medicated, and that's the extent of the evaluation or service that I would like from you. And I said that I do not really feel comfortable doing that …." (Doc. No. 44–1 at 26.)

Plaintiff's performance on both administrations of the NDRT indicated that his reading speed and ability to process information are well below average. (Tr. Ex. P–31.)

Plaintiff's NDRT results, along with his processing speed score on the WAIS–III, suggests that under time constraints, Plaintiff's ability to read and answer questions accurately is in the bottom one percentile of the testing norms as required by LSAC for comparable first semester college students. (Tr. 4 at 256–57 (Golden).) Dr. Van Auken opined that the administration of the NDRT to Plaintiff, when he was medicated, was an underestimation of his actual capacity given the fact that Plaintiff successfully completed various academic programs, including a rigorous four-year college experience at Baylor. (Doc. No. 44–3 at 63.)

On the WAIS–III, Plaintiff's Verbal IQ was 112, his Performance IQ was 106 and his Full Scale IQ was 110. (Tr. Ex. D–1.) [16] His score on the test measuring processing speed was seventy-nine which is in the eighth percentile. (Tr. 2 at 319–20 (Brunn).) Plaintiff's Verbal Comprehension Index score is 118.[17] (*Id.*) The discrepancy between Plaintiff's processing speed and his verbal comprehension index is clinically significant. (Tr. 2 at 319–20 (Brunn); Tr. 4 at 236 (Golden).) The difference between Plaintiff's Verbal IQ and Performance IQ is only six points, which is not considered clinically significant. (Tr. 4 at 145–46; 181–82 (Dempsey).) The Verbal IQ score and the Verbal Comprehension Index Score are not affected by a learning disability or ADHD. (Tr. 5 at 58 (Golden).)

Clinical significance and legal significance are two different things. Test scores that are clinically significant are not necessarily legally significant. (Doc. No. 44–1 at 40–41).

### 4. Interpretation of Plaintiff's Scores

LSAC regards the NDRT as an essential component of the psycho-educational evaluation process because the reading skills assessed by the NDRT most closely match those that are measured by the LSAT. (Tr. Ex. P–3 (LSAC Guidelines); Tr. 1 at 127 (Runyan).) Defense experts Drs. Golden and Gordon agree that the Plaintiff's NDRT results must be viewed as outliers because they are so low and so vastly different than the other tests. (Tr. 4 at 223–24 (Golden); Tr. 5 at 150–51 (Gordon).) Dr. Golden suggested that a psychologist would expect to see an individual with a severe brain injury given Plaintiff's NDRT score. (Tr. 4 at 241–42 (Golden).) [18]

Although Plaintiff's processing speed is clinically significant, the problem has not manifested itself in his standardized testing as evidenced by his average performance on the IOWA, the SAT, and the ACT, all of which are timed. (Tr. 3 at 359–61 (Dempsey).) Dr. Van Auken testified that although the American Psychological Association found that there was a general

---

**16.** Studies indicate that the average IQ of a college graduate is 115. The IQ of college graduates who take the LSAT is above this average, in the range of 118 to 120. Dr. Golden testified that the average IQ of physicians and attorneys is in the area of 127. (Tr. 5 at 56–59 (Golden).)

**17.** Plaintiff's reading comprehension score was in the average range. Plaintiff's LSAT did not indicate that his reading comprehension was negatively impacted. (Tr. 3 at 334.)

**18.** Specifically, Dr. Golden testified that "[Plaintiff's NDRT score] is one of the wors[t] Nelson–Denny's I have ever seen in an individual who has not had a brain injury, who has not been run over by a truck or something along those lines, or who doesn't have a history of very severe accommodations in school."

trend toward higher scores on tests where an individual has a higher IQ score, there are a variety of other factors that can serve to affect an individual's test scores including lack of sleep, anxiety, and lack of preparation. (Doc. 44–3 at 53–55.) Dr. Van Auken also explained that "[i]n the case of the LSAT, since it does involve logical reasoning problems and [reading] comprehension ... if you had deficits in those areas those could contribute to lower scores." (*Id.* at 54.)

## II. Conclusions of Law

Section 12189 of the ADA provides:

Any person that offers examinations or courses related to applications, housing, certification, or credentialing for secondary or post-secondary education, professional, or trade purposes shall offer such examinations or courses in a place and manner accessible to persons with disabilities or offer alternative accessible arrangements for such individuals.

42 U.S.C. § 12189. Defendant agrees that it is a covered entity under the Act and is, therefore, required to offer the LSAT in a manner that is accessible to individuals who are considered "disabled." (Doc. No. 17.)

■ Under the Act, "disability" is defined as: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such impairment; or (C) being regarded as having such impairment." 42 U.S.C. § 12102(2). The Code of Federal Regulations ("CFR") defines "major life activity" to include: "caring for

oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(I). The CFR provides that the term "substantially limits" means that the individual is "unable to perform a major life activity" or that the person is "significantly restricted as to the manner or duration under which [he] can perform a major life activity as compared to ... the average person in the population." 29 C.F.R. § 1630.2(j). In addition, the Supreme Court has determined that "to be substantially limited in performing manual tasks, an individual must have an impairment that prevents or severely restricts the individual from doing activities that are of crucial importance to most people's daily lives." *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 198, 122 S.Ct. 681, 151 L.Ed.2d 615 (2002).

The ADA requires plaintiffs to not only submit evidence of a diagnosis, but to "offer [ ] evidence that the extent of the limitation caused by this impairment in terms of their own experience ... is substantial." *Id.* (quoting *Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555, 567, 119 S.Ct. 2162, 144 L.Ed.2d 518 (1999)).

### A. Learning Disabilities, ADHD and the ADA

Pursuant to authority delegated by Congress, the Department of Justice ("DOJ") has promulgated regulations applicable to Title III of the ADA and specifically to § 12189.[19] Those regulations state in pertinent part:

[A]n examination covered by this section must assure that (I) The examination is

---

19. Congress authorized the Equal Employment Opportunity Commission ("EEOC") to promulgate regulations dealing with Title I of the ADA. The DOJ was given the responsibility of promulgating regulations for Title II and Title III of the Act. Courts have noted, however, that "Congress clearly intended the term

'disability' (and, therefore, the phrase 'substantially limits') to have uniform meaning throughout the ADA. Accordingly, wherever possible, the Court must define the phrase 'substantially limits' in a manner consistent with each of the agencies' interpretations." *Price*, 966 F.Supp. at 426 n. 2.

selected and administered so as to best ensure that, when the examination is administered to an individual with a disability that impairs sensory, manual, or speaking skills, the examination results accurately reflect the individual's aptitude or achievement level or whatever other factor the examination purports to measure, rather than reflecting the individual's impaired sensory, manual, or speaking skills (except where those skills are the factors that the examination purports to measure)[.]

28 C.F.R. § 36.309(b)(1)(i) (1999).

Learning disabilities and ADHD are clearly impairments within the meaning of the ADA.[20] The DOJ regulations specifically provide that learning disabilities are mental impairments under the Act. 28 C.F.R. § 35.104(1)(i)(B) ("The phrase physical or mental impairment means ... [a]ny mental or psychological disorder such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities.").

Defendant does not dispute that where individuals have ADHD or a learning disability, they qualify as having a mental impairment under the Act. (Doc. No. 17.) Defendant also does not dispute the fact that the functions required in taking the LSAT, specifically reading, processing information and learning, are considered major life activities under the ADA. (*Id.*) The House Report from the Committee on Labor and Education defined the scope of "major life activities" as follows:

A physical or mental impairment does not constitute a disability under the first prong of the definition for purposes of the ADA unless its severity is such that it results in a "substantial limitation of one or more major life activities." A "major life activity" means functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, working, and participating in community activities.

H.R. Rep. 101–485(II), 1990 WL 125563 (Leg.Hist.). Clearly, reading, learning, and processing information are major life activities under the ADA.

## B. Substantial Limitation

Having established that ADHD and a learning disability are mental impairments under the ADA and that reading and processing information are major life activities which are impacted by ADHD and learning disabilities, we must determine whether Plaintiff has established that he is substantially limited in the major life activity of reading and learning by his impairments.

Under regulations promulgated by the EEOC, "substantially limited" is defined as follows:

(1) The term substantially limits means:

(i) Unable to perform a major life activity that the average person in the general population can perform; or (ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

(2) The following factors should be considered in determining whether an indi-

---

**20.** Federal courts have consistently recognized that ADHD and learning disabilities are impairments under the ADA. *See, e.g., Rothberg v. LSAC,* 300 F.Supp.2d 1093 (D.Colo. 2004); *Bartlett v. N.Y. State Bd. of Law Exam'rs,* 2001 WL 930792 (S.D.N.Y. Aug. 15, 2001); *Price v. Nat'l Bd. of Med. Exam'rs,* 966 F.Supp. 419 (S.D.W.Va. June 6, 1997).

vidual is substantially limited in a major life activity:

(i) The nature and severity of the impairment; (ii) The duration or expected duration of the impairment; and (iii) The permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment.

29 C.F.R § 1630.2(j)(1) & (2). Thus, a person is considered an individual with a disability when the individual's important life activities are restricted as to the conditions, manner, or duration under which they can be performed as compared to most people. 28 C.F.R. § 35.104.

The Supreme Court has provided additional guidance in determining the meaning of "substantial" limitation. In *Sutton v. United Air Lines,* 527 U.S. 471, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999), the Supreme Court grappled with the meaning of "substantial" and determined that it suggested " 'considerable' or 'specified to a large degree' . . . of ample or considerable amount, quantity or dimensions." 527 U.S. at 491, 119 S.Ct. 2139. The Court, in particular, noted that "[t]he determination of whether an individual has a disability is not necessarily based on the name or diagnosis of the impairment the person has, but rather on the effect of that impairment on the life of the individual." *Id.* at 483, 119 S.Ct. 2139 (citations omitted). The determination of whether a person is substantially limited under the ADA is highly individualized. *Id.*

## III. Discussion

 Plaintiff contends that he suffers from ADHD Combined Type and from a learning disability. Specifically, Plaintiff contends that as a result of these impairments, individually or in combination, he has difficulty reading and processing information. Because of these problems, he is substantially limited and cannot complete tests that are strictly timed, putting him at a distinct disadvantage when competing with those who do not have these impairments. Plaintiff contends that he is entitled to reasonable accommodations under the ADA. *See* 42 U.S.C. § 12112(b)(5)(A); 28 C.F.R. § 36.309(b) (2). He contends that giving him additional time on the LSAT will level the playing field and permit him to accurately demonstrate his individual aptitude and achievement level.

### A. Attention Deficit Hyperactivity Disorder—Combined Type

Initially, we conclude that Plaintiff has not established that he suffers from ADHD Combined Type. The record does not support a finding that Plaintiff has demonstrated symptoms of hyperactivity—impulsivity to the extent that it is "disruptive and inappropriate for developmental level" in two or more settings as required by the criteria in the DSM–IV. Plaintiff's elementary, secondary, undergraduate and graduate record do not indicate that Plaintiff displayed the symptoms needed to support such a diagnosis. In fact, the opposite is true. Plaintiff appears to have been the model student. In elementary school his Progress Notes do not reveal that he was disruptive or that his conduct was inappropriate. With a few exceptions, his teachers in elementary school give him satisfactory or good grades for showing self-control, using his time well, listening attentively, working neatly, accepting responsibility, being courteous to others, respecting authority, understanding and following instruction and completing his work in a reasonable time. The few exceptions appear to have been in the first quarter of the year after the summer recess. In addition, Plaintiff's grades in elementary school do not indicate a problem.

The record does not support a finding that Plaintiff was in any way disruptive at Loyola Prep or that his behavior was inappropriate. The record reflects that Plaintiff was well liked by his peers and by his teachers at Loyola. Plaintiff's grades at Loyola in his college prep courses were excellent. He graduated with a GPA of 3.16. The letters from Plaintiff's high school teachers to Baylor University belie any suggestion of ADHD Combined Type. (Tr. Ex. D–4.) Moreover, Plaintiff was also an excellent athlete who demonstrated focus and leadership on the field. Disruptive and inappropriate behavior do not appear to be part of his make-up.

At Baylor and Notre Dame, Plaintiff conducted himself as one would expect an undergraduate and graduate student to conduct himself. Symptoms of ADHD were not recorded at either institution. He graduated from Baylor in four years with a GPA of 3.2. Plaintiff is slated to graduate with an MBA from Notre Dame in June 2007. There is also little to suggest that Plaintiff displayed the symptoms of ADHD in his social life or in his employment, other than self-reporting.

There is some suggestion in the record that Plaintiff may be inattentive. Several of his teachers in elementary school observed that Plaintiff was sometimes inattentive, was easily distracted, and had trouble keeping on task. At Loyola, Plaintiff evidently disciplined himself to avoid these problems, and the same seems to be true in undergraduate and graduate school. Plaintiff and his mother both supported the notion that Plaintiff was easily distracted, inattentive, and forgetful. Assuming for the sake of argument that all of the evidence in this regard is accepted as true, it may, at best, establish that Plaintiff suffers from Attention Deficit Disorder (ADD), and even then, the ADD would appear to fall within the range of "mild".

## B. Learning Disability

The evidence and testimony in this matter does appear to establish that Plaintiff has a learning disability. It is apparent from the testing that was done by Plaintiff's psychologists that Plaintiff has a processing speed problem. The difference between Plaintiff's Full Scale IQ and his processing speed score as reflected on the WAIS–III administered by Dr. Brunn cannot be disregarded. Moreover, the existence of this problem is supported by Plaintiff's academic fluency score on the WJ–III.[21] Based upon these measures, it is apparent that Plaintiff has some problem processing information and that this processing speed problem impacts the speed with which he reads.

However, the fact that Plaintiff is clinically diagnosed as having a learning impairment does not automatically mean that he is entitled to an accommodation under the ADA. An impairment and a disability are two different things. In order to receive an accommodation under the Act, Plaintiff's impairment must substantially limit his ability to read so as to significantly restrict the condition, manner, and duration under which Plaintiff can perform the task of reading and processing information as compared to the condition, manner, or duration under which the average person in the general population can perform the same activity.

In support of his contention that he is substantially limited, Plaintiff has presented evidence and testimony that he has received informal accommodation from his

---

**21.** We give little credence to Plaintiff's scores on the NDRT. They are so low that they must be treated as outliers or worse.

teachers and professors because of this reading disability. However, the record reveals that the informal accommodations that he received were also generally available to the other students. Moreover, in some of Plaintiff's more demanding classes, he received no accommodations. Whether the Plaintiff received the generally available informal accommodations or whether he received no accommodations, Plaintiff was, nevertheless, an excellent student. It is interesting to note that although both Baylor and Notre Dame provide the opportunity for students to register if they wish to receive formal accommodations because of a disability. Plaintiff never availed himself of this opportunity at either institution.

More significantly, during Plaintiff's elementary and secondary education, Plaintiff was required to take standardized tests. In elementary school it was the IOWA Reading Test. In high school, it was the ACT and the SAT. All of these tests are strictly timed and all involve reading and processing information. Plaintiff took all of these tests without accommodation. On the IOWA Reading Test, Plaintiff scored consistently in the average or above average range. Likewise, on both the ACT and the SAT, Plaintiff scored in the average range. In 2003, Plaintiff took the LSAT without accommodation. His score was 150 out of a possible 180. This score falls within the average range.

Defendants argue that because Plaintiff has scored in the average or above average range on all of the timed tests that he has taken, it is apparent that Plaintiff's learning disability has not substantially affected his ability to read and take a test. Defendants support their position by pointing to Plaintiff's IQ which is average and argue that Plaintiff's average scores on these timed tests are exactly what one would expect from someone with an average IQ.

Plaintiff responds that it is inappropriate to depend on quantitative outcomes alone in determining whether a disability exists. Rather, it is the manner in which the outcomes are achieved that is determinative of a disability. The definition of disability based on outcomes alone particularly when dealing with learning ·disabilities would prevent the court from making a finding of disability in the case of an individual who is extremely bright and hardworking.

We agree that outcomes alone should not be determinative. However, if Plaintiff's IQ was 140 and he scored within the average range on standardized tests and the LSAT, the suggestion that a learning disability was the cause would have more credence.

Plaintiff suggests that our decision should be guided by the district court decisions in *Rothberg v. LSAC*, 300 F.Supp.2d 1093 (D.Colo.2004), and *Bartlett v. N.Y. State Board of Law Examiners*, No. 93 CIV 4986, 2001 WL 930792 (S.D.N.Y. Aug. 15, 2001), both of which involved learning disabilities and requests for accommodation under the ADA. In both cases, the district courts concluded that the learning disabilities substantially hindered Plaintiff in the major life activities of reading, learning and processing information, and accommodations were granted. *Rothberg* and *Bartlett* are of little assistance here. The law recited by Judge Daniel in *Rothberg* and by Judge Sotomayor in *Bartlett* is helpful. However, the guidance stops there. Factually, the cases of Abby Rothberg and Marilyn Bartlett were very different from the instant case. The extent, history and impact of the disabilities in those cases left little doubt that Plaintiffs were substantially limited in major life activities as compared to the average person. The same cannot be said for this case.

We find the instant case more like the cases of *Gonzalez v. National Board of Medical Examiners*, 60 F.Supp.2d 703 (E.D.Mich.1999) and *Price v. National Board of Medical Examiners*, 966 F.Supp. 419 (S.D.W.Va.1997). In those cases, the district court denied accommodations based upon the fact that the impairments, ADHD in one case and ADHD and reading disorders in the other, did not substantially limit them in performing a major life function as compared to most people in the general population. *Gonzalez* and *Price* are more similar factually to the instant case than are *Rothberg* and *Bartlett*.

*Gonzalez* is particularly instructive. In *Gonzalez*, the plaintiff sought an accommodation for the medical boards because he had a disability related to slowness in language processing. *Gonzalez*, 60 F.Supp.2d at 706. Gonzales graduated from high school, received a 1050 (out of 1600) on the SAT without an accommodation, graduated from the University of California at Davis with a 3.15 GPA, took the MCAT twice, and was accepted at the University of Michigan Medical School. *Id.* at 708 n. 1. Gonzales had no history of formal accommodations prior to asking for one on the medical boards. *Id.* As the *Gonzalez* Court noted, "[a]lthough significant academic achievement does not negate a student's claim that he has a learning disability, the education history is relevant to the inquiry." *Id.* at 708. The court in *Gonzalez* was persuaded by testimony that the plaintiff did "not have a documented history of academic achievement below expectations that would support a diagnosis of a learning disability" and noted that "[a]verage, or even slightly below average, is not disabled for purposes of the ADA." *Id.*

Plaintiff's academic history is remarkably similar to that discussed in *Gonzalez*. There is no suggestion beyond a few notations made on elementary school reports cards that Plaintiff was disruptive or that he displayed any of the symptoms that are consistent with a finding of ADHD. He did not seek additional help or formal accommodations for ADHD or a learning disability in high school even when faced with classes that required significant amounts of reading involving difficult texts. He never sought to take advantage of the formal accommodations available to students with learning disabilities at his undergraduate institution, nor did he attempt to secure accommodations throughout his graduate studies.[22] Dr. Brunn's testimony suggests that Plaintiff may have some difficulty reading. Nevertheless, his reading impairment does not substantially limit his ability to read and learn as compared to the average person or most people as is required under the ADA.[23]

Given all of the evidence presented, including Plaintiff's test scores, clinical evaluations, educational history, and his reported ability to function in both academic and professional environments, we are not persuaded that Plaintiff has a disability as defined under the ADA. Accordingly, we will deny his request for injunctive relief in the form of an accommodation on the LSAT and enter judgment in favor of Defendant.

An appropriate Order follows.

---

22. We note that while Plaintiff had asked for a formal accommodation on the GMAT, there is no evidence that he requested a formal accommodation for any other exam—standardized or in-class—prior to the GMAT.

23. We would reach the same conclusion if we applied the EEOC definition of substantial limitation found in the regulations dealing with the major life activity of working. That definition provides that substantial limitation means "significantly restricted ... as compared to the average person having comparable training, skills and abilities", 29 C.F.R. § 1630.2(j) (3)(i).

*ORDER*

AND NOW, this *9th* day of *March,* 2007, after trial by judge sitting without a jury, and in accordance with the Findings Of Fact And Conclusions Of Law attached hereto, the Court finds that Plaintiff has not demonstrated that he has a disability as defined under the Americans With Disabilities Act, 42 U.S.C. 12101 *et seq.,* and is not entitled to an accommodation to take the Law School Admissions Test. Accordingly, Plaintiff's request for injunctive and other relief is DENIED. Judgment is entered in favor of Defendant Law School Admissions Council, Inc., and against Plaintiff Jonathan Love.

IT IS SO ORDERED.